[No. A062623. First Dist., Div. Two. Mar. 13, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER MORGANTI, Defendant and Appellant.

**[Opinion certified for partial publication*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III B, III D, III E, III F and III G.

**COUNSEL**

Mark L. Christiansen, under apppointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

Appellant Christopher Morganti (Morganti) was convicted of second degree murder, personal use of a knife during commission of that crime, and arson of an inhabited structure. He was sentenced to 16 years to life for the murder, and 5 years for arson, and ordered to pay a restitution fine of $4,200. Morganti's codefendant George Paterson (Paterson), though charged with the same murder, was convicted as an accessory after the fact. On appeal, Morganti alleges multiple instances of reversible error and challenges the sufficiency of the evidence to support his convictions. We affirm.

## II. STATEMENT OF FACTS

On the evening of Saturday, November 16, 1991, Ronald Turner (Turner) was found dead in the manager's unit at the La Grande Motel in Cloverdale.

Turner had been stabbed 26 times and his skull was fractured. The building where Turner was found was locked and on fire. Investigators determined the fire was caused by arson. Evidence collected at the scene included a leather glove with a small piece of hair inside, a section of linoleum imprinted with a bloody shoe print, and a bloodstained door chain from the manager's unit.

## A. *The La Grande Motel*

Prior to his death, Turner lived at and helped run the La Grande. Morganti was a frequent guest at the motel. There was evidence that both Turner and Morganti abused drugs, that they used drugs together, and that Morganti supplied Turner with drugs.

Debra Ebert was an occasional resident at the La Grande. Ebert testified about a scheme Turner used to pay Morganti for drugs. When the owner was present, Morganti would give Turner his credit card to charge his rent. Turner would prepare a charge slip but then destroy it once the owner left. Thus, Morganti would receive free rent in exchange for the drugs he supplied Turner. Turner admitted to Ebert that he failed to destroy some of the charge slips. Morganti's wife, Cheryl, also told Ebert that Turner failed to "pull" the charges, and showed Ebert a credit card statement containing room charges.

Diane Baker, a resident and maid at the La Grande, testified that, on the day before Turner's death, she saw Morganti and Turner together in the manager's unit talking about money. Morganti asked Turner if Baker knew where to deliver "the money" and Turner responded that "it" was taken care of and that Morganti should call him at 5 p.m. At 4 that afternoon, Turner answered the telephone, became visibly angry and stated "Chris, I told you to call at 5 o'clock." At 4:15, Turner answered the phone, again telling the caller, "Chris, I told you to call at 5 o'clock." Turner slammed down the phone, disconnected the receiver and told Baker "Chris was getting very pushy."

On the morning of the murder, Baker again saw Morganti and Turner together in the manager's unit. That evening, between 10 and 11 p.m., she noticed a silver-blue car in the parking lot of the motel. Baker did not recognize the dark-haired man sitting in the car. After returning to her room, which was located next to the manager's unit, Baker heard loud noises and Turner's voice.

Richard Cox was a guest at the La Grande on the night of the murder. He testified that, around 10:45 p.m., he saw a man in the motel complex

standing next to a car with a dented taillight. The man approached Turner, who said "Oh, it's you." Cox later identified Paterson as the man who approached Turner that night.

James Marshall checked into the La Grande on the night of the murder. Marshall testified that the man standing behind the counter gave him the wrong key, and that Turner later gave him the correct room key. Prior to trial, Marshall identified Morganti in both a photographic line up and a live lineup as resembling the man who gave him the wrong key. But, at trial, Marshall testified Morganti was not the man he saw on the night of the murder and that he felt the prosecution pressured him to identify Morganti.

## B. *Bonnie Martin*

Morganti owned a house at 538 Reed Court in Healdsburg. At the time of the murder, Morganti was living in the garage with his wife, Cheryl, and renting the house to Bonnie Martin.

Shortly after the murder, Martin was interviewed by the police. Martin told police that, on the night of the murder, Morganti and Paterson left the house in separate cars between 9:30 and 11 p.m. Morganti drove a tan pickup and Paterson left in a silver sedan. Morganti was carrying his knife in a sheath on his belt. Morganti returned home alone at around midnight, went straight to the washing machine, and started a load of laundry. The next morning, Martin found Morganti's knife inside the washer.

At trial, Martin testified differently. She said that Morganti spent all of the weekend during which the murder occurred cleaning out the garage which had been flooded by rain. She stated that Paterson had left the house on the night of the murder to buy groceries between 9 and 10:30 p.m. and then left the house again by foot about an hour later. Martin was unsure if Morganti left the house that evening but also testified he was in and out all evening. Martin told the jury she found Morganti's knife in the washer on the morning after the murder but thought she might have knocked it off the shelf into the washer on the previous evening, and claimed she also found a screwdriver in the washer.

Martin testified that Morganti told her Turner owed him money. She claimed that Morganti had asked her to collect the debt from Turner because he did not want to deal with it. After the murder, Martin told Morganti the police had been asking questions about him and Morganti responded that the police could have been asking about him because he had gone to Cloverdale to collect $50 from Turner.

## C. *Mario Morganti*

Morganti's 13-year-old son, Mario, testified he spent the night of the murder at Reed Court. That evening, Mario saw Morganti in the garage sharpening an ax and asked what he was doing. According to Mario, his father sarcastically and jokingly replied: "I'm going to go cut down a tree," and added, "Don't worry about me you better get in the house, it's getting cold out here."

Mario testified that he went in the house, went to bed, and woke up at around 11 p.m. to find his father in the hallway. Morganti was wearing either socks or old white shoes without laces. Mario admitted at trial that he previously told investigators his father was wearing Nike tennis shoes, but explained that he always refers to tennis shoes as Nikes. Mario conceded he was unsure, but thought Morganti was only wearing socks.

Mario claimed he did not see his father leave home on the night of the murder. He also denied seeing Morganti with a knife that night. Later, Mario admitted that his father had a habit of carrying a little buck knife on his side, but then stated he saw the knife sometimes, but hardly ever. Later still, Mario admitted seeing Morganti with a Kalinga knife on the night of the murder.

Mario testified that he saw the sheath for his father's knife in the washer on the morning after the murder. Later, he changed that testimony by claiming that the sheath was in his dad's hat, not in the washer. Mario repeatedly denied seeing Morganti's knife in the washing machine.

Mario testified that his father rode a motorcycle but that Mario never saw him wear motorcycle gloves. He claimed not to know what "welder's" gloves looked like and said he did not recognize a glove found at the crime scene as similar to the type of gloves his father wore. According to Mario, Morganti wore short gloves with the finger coverings cut off.

The trial judge admitted into evidence a tape-recorded interview of Mario which had been conducted shortly after the murder, on November 21, 1991. During that interview, Mario stated that he saw Morganti leave home at approximately 11 p.m. on the night of the murder. Morganti was carrying a "hatchet" and told Mario he was going to cut down a tree. When Mario asked why, Morganti responded "Don't worry about me. You don't need to know." Morganti was wearing a Kalinga knife when he left his house. He got into a yellow station wagon with three men. Later that evening, Mario saw Morganti return home. Morganti was wearing white Nike shoes without

laces. The next morning, Mario saw Morganti's knife when Bonnie Martin took it out of the washing machine. Mario also told investigators that Morganti wore thick brown gloves when he rode his motorcycle. He described the gloves as "welder gloves" and said they had a picture of a steer on them.

## D. *The Mercury Monarch*

A Mercury Monarch with a broken and patched taillight was towed to the Cloverdale Police Department on November 19, 1991. The Monarch had been found near the Healdsburg Hospital. On the night of the murder, at around midnight, Paterson had gone to the parking lot of the Healdsburg Hospital to purchase cocaine.

The Monarch was owned by Albert Carusillo. Carusillo testified that, on the morning of the murder, he lent the Mercury to Paterson for three hours so Paterson could visit his father. Paterson did not return the car and later told Carusillo it was impounded when Paterson was pulled over for drunk driving.

Diane Baker and Richard Cox both identified the Monarch as the car they saw at the La Grande on the night of the murder. Debra Ebert was living at Morganti's house with Bonnie Martin at the time of the murder. She testified that the Monarch resembled a car she saw in the driveway of Morganti's house that night.

## E. *George Paterson*

On the morning of November 18, 1991, Paterson was driving Morganti's pickup when he was pulled over by police on a routine traffic stop. Paterson explained that he received the fresh deep cut on his left index finger the previous day while on a roofing job. Paterson also had bloodstains on his jeans. During a subsequent interview at the police department, Paterson told investigators he had worked for Morganti in the past but had not seen him for two and a half years until he ran into him on Sunday, November 17th. Morganti agreed to loan Paterson his truck so he could go to work and Paterson had picked it up on the morning of the 18th. Paterson explained he cut his finger and received the bloodstains on his jeans during a roofing job.

After Paterson was interviewed, he called police investigators and expressed concern that he would be arrested. A few minutes later, he called again and said he knew who committed the murder in Cloverdale and how it happened. He also expressed concern for his safety. Eventually, Paterson

gave police a lengthy statement which implicated both Morganti and himself in Turner's murder. Paterson did not testify at trial and that portion of his statement which implicated Morganti was not offered by the prosecution.[1]

F. *The Physical Evidence*

A criminalist testified that the single hair found in the glove that was left at the crime scene was similar to Morganti's arm or hand hair. The criminalist also testified that the bloody shoe print left at the crime scene was made by a person wearing a Nike brand athletic shoe, based on the clear impression of the "swoosh" trademark.

Several tests were performed on bloodstain samples collected during the investigation. From these tests, the prosecution's expert was able to exclude certain individuals as sources of some of the stains and to identify others whose blood types were consistent with the stains.

The expert tested five distinct stains from Paterson's jeans. Morganti and Turner were excluded as potential donors of four out of the five stains. The genetic traits exhibited by the stains were consistent with Paterson and occur in one out of fourteen Caucasians.[2] The expert opined that the fifth stain was not Morganti's blood, but was consistent with both Turner and Paterson.[3]

A bloodstain found on a piece of tan upholstery in Morganti's pickup did not come from Morganti but could have been Paterson's or Turner's. A bloodstain found on a piece of gray upholstery in the Mercury Monarch did not come from Morganti or Paterson but could have been Turner's. The genetic traits exhibited by this stain occur in one out of one thousand seven hundred fifteen Caucasians.

---

[1]This statement, which is not in the appellate record, was one ground for Morganti's motion for a separate trial. According to Morganti, Paterson "confessed" to at least being an accessory to the homicide and implicated Morganti as Turner's murderer. The prosecution conceded the statement implicated Morganti, but informed the court it intended to use only one small portion of the statement which did not implicate Morganti. The court reviewed Paterson's entire statement and ruled the portion the prosecution intended to use did not implicate Morganti.

[2]Similarly, a bloodstain on a shirt found at Reed Court was not Morganti's or Turner's, but could have belonged to Paterson. The genetic traits appear in one out of fourteen Caucasians.

[3]Both Morganti and the People have misstated the test results pertaining to Paterson's jeans. Contrary to Morganti's contention, testing on the jeans did not establish that all of the blood on the jeans belonged to Paterson. The prosecution's expert opined that one of the stains was consistent with either Turner or Paterson. Contrary to the People's contention, the expert did not opine that the genetic traits exhibited by this particular stain occur in one out of fourteen people. The expert did not offer any conclusion about the frequency of the occurrence of the genetic traits exhibited by this particular stain.

A bloodstain found on the washbasin at Reed Court did not come from Morganti or Paterson, but could have been Turner's blood. The genetic traits exhibited by this stain occur in one out of sixty-one Caucasians.

A bloodstain on the door chain for the manager's unit at the La Grande did not come from Turner or Paterson but could have been Morganti's blood. The genetic traits exhibited by this stain occur in one out of twenty-two Caucasians.

## G. *Christopher Morganti*

Morganti was interviewed by police on November 20, 1991. Morganti said he had known Turner for about a month and did not think Turner was involved in drug dealing. He told police that he rode his motorcycle to the La Grande on the day of the murder and had a beer with Turner but that he did not see Turner that evening. Morganti said he stayed home and watched videotapes with his wife. When questioned about scratches and swelling on his arm and shoulder, Morganti stated he was bitten by a spider.

Morganti testified at trial. He testified that he first stayed at the La Grande in late July or early August of 1991. He was not employed and lived on retirement savings and an equity loan. Morganti admitted to using cocaine three or four times a week and spending a couple of hundred dollars a day to get "high." He became friends with Turner while living at the La Grande. They supplied each other with drugs and got "high" together.

Morganti testified that he had worked with Paterson at a lumber company but had not seen him since 1988 until the two ran into each other on November 13, 1991. Paterson was trying to get off drugs and needed a place to stay. Morganti, as a consequence, agreed to let him stay at the garage at Reed Court. Paterson showed up at Reed Court on Friday, November 15th.

On November 15th, Turner asked Morganti to "cop" him drugs. Morganti said he would get some drugs and promised to call later. Morganti called Turner at 5 p.m. to discuss the transaction but Turner said he did not have his money together yet. Morganti called again at 6:30 or 7 p.m. and told Turner he would not wait any longer. Morganti then sent Paterson to get some drugs. Later that evening Paterson and Morganti shared the drugs.

Morganti testified that, on November 16th, he received a credit card bill which erroneously charged him $129 for three nights' stay at the La Grande. Morganti called Turner around 10:30 a.m. and rode over to the motel on his motorcycle around 3 or 4 p.m. Turner agreed the charges were improper,

said he would credit Morganti's account, and again asked Morganti to get him drugs. Morganti agreed and said Paterson would bring the drugs over later.

Morganti testified that he went to the house of his ex-wife, Cynthia English, to pick up Mario for the weekend. Morganti called Turner at 5:30 p.m. from English's home. Turner said he had the money to buy drugs and the two agreed to make the deal around 9:30 or 10 p.m. Morganti then returned to Reed Court. Rain had flooded the garage. He spent a few hours building a platform and cleaning up and used his ax to knock down part of a fence. He joked with Mario about using the ax to go cut down a tree.

According to Morganti, around 9 p.m., he put his knife in a sheath on the shelf above the washing machine. He recalled that both he and Bonnie Martin did laundry that night. Between 9:30 and 10 p.m., Morganti went to the store and then returned home and had dinner with his wife.

That night, Morganti had asked Paterson to purchase drugs for him and to deliver some to Turner. When Paterson had not returned by 11 p.m., Morganti went to the nearest phone booth and called the La Grande but received no answer. Morganti also called his answering machine, which he kept at his father-in-law's house, but had no message from Turner. Morganti used his wife's credit card number to make these phone calls.

According to Morganti, he went home after making the phone calls and did not go out again. Morganti recalled that Mario was asleep just before Morganti left to use the phone, and that he was still asleep around 12:30 or 1 a.m. when Morganti went to take a shower. At that point, Morganti was wearing white socks. He claimed not to own a pair of Nikes although he did have some tennis shoes.

Paterson eventually arrived with the drugs. After giving a share to Paterson, Morganti and his wife used some of the drugs and then went to sleep. Morganti testified that he did not go to Cloverdale on the evening of November 16, 1991, that he did not kill Turner, and that he had no knowledge about who committed the murder.

Morganti admitted that the glove found at the crime scene was his and that he regularly carried a Kalinga knife. He claimed that the marks found on his arm were a spider bite and scratches he received while working in his yard on the night of the murder. Morganti also recalled touching the door chain on the manager's unit at the La Grande but did not recall bleeding on it.

## III. Discussion

### A. *The Blood Evidence*

Morganti challenges the trial court's decision to admit evidence pertaining to two distinct types of tests that were performed to identify the sources of blood samples in this case: (1) a gamma marker (GM) blood analysis performed pursuant to the agglutination inhibition method (hereafter, the agglutination inhibition test); and (2) a type of DNA analysis known as polymerase chain reaction (hereafter, the PCR analysis). For reasons that follow, we conclude both types of blood evidence were properly admitted.

■ The admissibility of expert evidence pertaining to a new scientific technique is determined by applying the following analysis set forth by our Supreme Court in *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]: " '(1) [T]he *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. [Citation.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]' " (*People* v. *Leahy* (1994) 8 Cal.4th 587, 594 [34 Cal.Rptr.2d 663, 882 P.2d 321], quoting *People* v. *Kelly, supra,* 17 Cal.3d at p. 30, italics in original.)[4]

With respect to the first prong of this test, "reliability" means that the technique " 'must be sufficiently established to have gained general acceptance in the particular field in which it belongs.' " (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30, italics omitted.) In determining whether there has been "general acceptance," "[t]he goal is not to decide the actual reliability of the new technique, but simply to determine whether the technique is generally accepted in the relevant scientific community." (*People* v. *Barney* (1992) 8 Cal.App.4th 798, 810 [10 Cal.Rptr.2d 731].) Courts "must consider the quality, as well as quantity, of the evidence supporting or opposing a new scientific technique. Mere numerical majority support or opposition by persons minimally qualified to state an authoritative opinion is of little value . . . ." (*People* v. *Leahy, supra,* 8 Cal.4th at p. 612.)

With respect to the second prong of the *Kelly* test, regarding the expert(s)' qualifications, "[t]he trial court is given considerable latitude in determining

---

[4]This test was adopted from *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145], which was overruled in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469, 113 S.Ct. 2786]. Nevertheless, *People* v. *Kelly* and its progeny continue to represent the law of this state. (*People* v. *Leahy, supra,* 8 Cal.4th 587.)

the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. [Citations.]" (*People* v. *Kelly*, *supra*, 17 Cal.3d at p. 39; see also *People* v. *Cooper* (1991) 53 Cal.3d 771, 813 [281 Cal.Rptr. 90, 809 P.2d 865]; 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1844, pp. 1799-1800, and cases cited therein.)

The determination whether correct scientific procedures were used in a particular case is a "third-prong" of the *Kelly* test; it is not merely a question of evidentiary weight, but an element of the initial admissibility determination. (*People* v. *Axell* (1991) 235 Cal.App.3d 836, 862 [1 Cal.Rptr.2d 411]; *People* v. *Barney*, *supra*, 8 Cal.App.4th at pp. 822-824.)

## 1. The Agglutination Inhibition Evidence

Morganti challenges the admissibility of evidence relating to the agglutination inhibition tests performed on behalf of the prosecution in this case. He contends the tests excluded Turner as the source of the bloodstains found on Paterson's jeans and also excluded Paterson as the source of stains found on other "critical items." This argument is at least partially incorrect, since Turner was not excluded as a source of one of the stains on Paterson's jeans. In any event, we conclude the agglutination inhibition evidence was properly admitted.

### a. Prong One—General Acceptance

"The agglutination inhibition process detects the presence of specific genetic markers in the bloodstream. Blood samples are dissolved in a saline solution and centrifuged to remove debris; a liquid remains. A chemical known as an 'agglutinator' is added to determine the presence of a specific genetic marker. If the marker is present, the agglutinator will chemically bind with it and neutralize. [¶] To discover whether this has occurred, antigen-coated indicator cells are added to the extract; these cells react only to the specific agglutinator used. There is no reaction if the agglutinator has neutralized. If it has not, however, the indicator cells clump together; and it is then known that the sample does not contain the particular genetic marker tested. Separate tests determine the presence of other genetic markers." (*People* v. *Yorba* (1989) 209 Cal.App.3d 1017, 1024, fn. 5 [257 Cal.Rptr. 641] (hereafter *Yorba*).)

Agglutination inhibition evidence was admitted in *Yorba, supra,* 209 Cal.App.3d 1017.[5] ■ "[O]nce a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*People v. Kelly, supra,* 17 Cal.3d at p. 32.) Thus, case-by-case adjudication as to the "general acceptance" prong of the *Kelly* test is not required once the scientific technique in question has been endorsed in a published appellate opinion. (*People v. Barney, supra,* 8 Cal.App.4th at pp. 824-825.)

■ Morganti concedes that agglutination inhibition testing was approved in *Yorba* but, nevertheless, maintains that *Yorba* was "improperly used by the trial judge . . . to establish the reliability" of the particular agglutination inhibition method used in the present case. Morganti's long and convoluted argument boils down to this: agglutination inhibition testing involves the "working together" of two sets of cells, each of which has been separately mixed with foreign substances, to determine whether certain genetic markers are present. Different techniques can be used to achieve a "working together" of the cells. In this case, Seriological Laboratories (Seri) used a method referred to as the "Seri slide rotation method." Morganti contends, as he did below, that *Yorba* did not approve this specific method of working together the cells but only approved of agglutination inhibition testing generally. According to Morganti, the slide rotation method is not a generally accepted method of working together the cells.

The agglutination inhibition tests at issue in this case were performed by Gary Harmor, a forensic serologist who has been employed at Seri since that company's inception in 1978.[6] Harmor testified at the *Kelly* hearing that there is more than one means by which to agitate or work together cells when performing this test: "The microtitre method Doctor Schanfield uses is a v-bottom plastic plate with wells in it, if you will, depressions in it. [¶] He puts all these reagents together and spins them to force the cells together.

---

[5]In *Yorba,* the defendant was convicted of various crimes, including murder. On appeal, he challenged the admission of a bloodstain analysis based on agglutination inhibition testing. The *Yorba* court briefly summarized the evidence presented at the *Kelly* hearing that was conducted in that case. Two prosecution witnesses, Moses Schanfield and Gary Harmor, described the test and testified as to its reliability. The *Yorba* court held that the uncontradicted testimony of these witnesses supported the trial court's conclusion that ". . . the scientific community accepts agglutination inhibition as a valid and reliable scientific technique." (*Yorba, supra,* 209 Cal.App.3d. at p. 1025.)

[6]Seri and Harmor use the term "absorption inhibition" rather than agglutination inhibition. Both terms refer to the same test. The flat plate method of working together the cells is referred to in the record as the "Wraxall slide-rotation method," the "Seri-slide method" or simply the "slide rotation method."

There's also a tube technology in which actually small glass test tubes are used the [reagents] are placed in the tube and the tubes are centrifuged and checked for clumping or no clumping of the cells. *With the slide technology that's been discussed and used in this case and Yorba the reactants are all placed in a flat plastic plate and then rotated by a machine to force the cells together.*" (Italics added.)

Morganti is correct that the *Yorba* decision does not describe the particular method used in that case to work together the cells. However, Mr. Harmor testified in this case that he also performed the agglutination inhibition test in *Yorba*; he is the Gary Harmor mentioned by name in that published opinion. (See *Yorba, supra,* 209 Cal.App.3d at p. 1025.) Harmor testified unequivocally that he performed the exact same test in the present case that he performed in *Yorba—the same method of working the cells together was used in both cases.* Harmor recalled that his procedure was challenged in *Yorba,* and he provided a step-by-step explanation of the testing process. Thus, *Yorba* establishes general acceptance of the agglutination inhibition test performed in this case.

In light of *Yorba,* Morganti's numerous attempts to prove the record before us does not establish general acceptance are irrelevant. The prosecution was not required to make such a showing; absent evidence as to a change of attitude in the scientific community, *Yorba* conclusively establishes general acceptance. (See, e.g., *People* v. *Barney, supra,* 8 Cal.App.4th at p. 824; *People* v. *Kelly, supra,* 17 Cal.3d at p. 32.) We agree with the trial court that Morganti introduced no credible evidence as to such a change.

Without reference to the record, Morganti contends that "[t]he evidence showed at least two scientists of reknown [*sic*] in the relevant community disputed the [slide rotation] method." The only witness who questioned the slide rotation method was Morganti's expert, Dr. Benjamin Grunbaum, a biochemist and forensic biologist. Grunbaum opined that the slide rotation method was not an effective method of working together the cells, that it produced ambiguous results, and that the agglutination inhibition test could only be effective if agitation was achieved by centrifugation rather than slide rotation.

The trial court made two rulings with respect to Dr. Grunbaum's testimony in this case, both of which we approve. First, the court found that Grunbaum's testimony was primarily a critique of allegedly careless testing, a matter relevant to weight of evidence and not to its admissibility. (See, e.g., *People* v. *Farmer* (1989) 47 Cal.3d 888, 913 [254 Cal.Rptr. 508, 765 P.2d 940].) Second, the court ruled that Grunbaum's testimony deserved

"little weight" with respect to the issues relevant to the *Kelly* hearing and that much of his relevant testimony was not credible. The court gave several quite satisfactory reasons for this conclusion including: (1) Grunbaum admitted he had limited experience and qualifications regarding the methods or techniques at issue in this case. Thus, for example, Grunbaum admitted he had never performed an agglutination inhibition test and described the process as very complicated and complex; (2) Grunbaum was considerably biased against Harmor. Indeed, he accused Harmor of falsifying test results; (3) Much of Grunbaum's criticisms and opinions were unsupported by reason or lacked foundation. The trial court's reasoning is amply supported by the record and we defer to his determinations of credibility and competency.

We assume that Dr. Schanfield is the second scientist to whom Morganti refers as disapproving of the slide rotation method. Dr. Schanfield, who did not testify in this case, was an expert testifying in *favor* of admitting the agglutination inhibition evidence in *Yorba.* (*Yorba, supra,* 209 Cal.App.3d 1017.) The only evidence we find in this record that Schanfield is critical of the slide rotation method is Dr. Grunbaum's statements to that effect. Grunbaum maintained that Schanfield has become "very critical of the slide/rotation method" since *Yorba* was decided, but he also admitted that Schanfield has never produced or published an article attacking the slide rotation method. The trial court either discredited Grunbaum's testimony or found it insufficient, by itself, to raise an issue as to a change in attitude in the scientific community. We agree.

### b. *Prong Two—Harmor's Expertise*

Morganti contends that Harmor should not have been accepted as an expert in this case because (1) he was not qualified to render an opinion as to whether agglutination inhibition is generally accepted in the scientific community, and (2) he was biased in favor of the prosecution.

Morganti underestimates the impact of published precedent. Once general acceptance of a scientific technique is established by precedent, it need not be established again under the second prong of the *Kelly* test. Of course an expert must always be qualified.[7] But precedent eliminates the need, in a case such as this, for expert testimony *on the subject of the reliability of the scientific technique in question.* (*People* v. *Leahy, supra,* 8 Cal.4th at p.

---

[7]To the extent Morganti's arguments are meant as a general challenge to Harmor's qualifications to provide expert testimony regarding the tests he performed, we find them meritless. Contrary to Morganti's contention, the fact that Harmor is a technician rather than a scientist does not prevent him from giving expert testimony. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to

611.).[8] Therefore, whether Harmor was qualified to testify as to the general acceptance of the agglutination inhibition test is not a relevant issue in our case.

Morganti's "bias" evidence pertained to a civil judgment entered against Brian Wraxall, the director of Seri. The judgment related to testing that was done by Wraxall, personally, in a different criminal case. Morganti complains that the civil judgment and evidence pertaining to it were improperly stricken from the record because this evidence establishes Harmor was biased in favor of the prosecution and that this partiality rendered him unqualified to testify as an expert. The trial court ruled the civil judgment was irrelevant because it involved Wraxall, who was not a witness in this case, and that the evidence had no bearing on Harmor's credibility or any disputed issue relating to the *Kelly* hearing. The trial court enjoys wide discretion when ruling on issues of relevance (see, e.g., *People* v. *Edwards* (1991) 54 Cal.3d 787, 817 [1 Cal.Rptr.2d 696, 819 P.2d 436]) and expert witness qualifications (see, e.g., *People* v. *Kelly, supra,* 17 Cal.3d at p. 39). We find that this discretion was not abused here.

### c. *Prong Three—Correct Scientific Procedures*

Morganti contends that *Kelly*'s third prong imposed on the prosecution the burden of proving general acceptance of the slide rotation method. In contrast, the People contend *Yorba* relieved the prosecution of having to prove anything under *Kelly*. Both parties are mistaken. Since the third prong of the *Kelly* test requires case specific proof that correct procedures were employed, it cannot be satisfied by relying on a published appellate decision. (*People* v. *Barney, supra,* 8 Cal.App.4th at p. 824.) But, when general acceptance is established by precedent, the "third-prong hearing" that must be conducted will not approach the "complexity of a full-blown" *Kelly*

---

qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).)

We agree with the trial court that Harmor was sufficiently qualified to give expert testimony regarding the absorption inhibition testing he conducted in this case. Harmor, a forensic serologist, helped found Seri 15 years ago. He works as a consultant for both the prosecution, the defense and private parties. He has taught seminars on genetic markers used in forensic science and has published articles. Harmor has been performing absorption inhibition testing since 1979 and has used that test to locate GM markers since 1983. He has previously testified as an expert regarding GM testing between 30-35 times and has testified at no less than 6 *Kelly* hearings in California, one of which was the hearing in *Yorba*.

[8]The *Leahy* court held that a police officer's testimony was insufficient to establish general acceptance of a "HGN" field sobriety test in the scientific community but also stated that ". . . once the *Kelly* standard has been met, as reflected by a published appellate precedent, the prosecution will not be required to submit expert testimony to confirm a police officer's evaluation of an HGN test." (*People* v. *Leahy, supra,* 8 Cal.4th at p. 611.)

hearing. (*Id.* at p. 825.) "All that is necessary in the limited third-prong hearing is a foundational showing that correct scientific procedures were used." (*Ibid.*) The trial court properly found that the prosecution made the necessary foundational showing. Not only did Harmor testify that he followed established procedure or protocol, his testimony establishes that he followed the exact procedures that were deemed correct in *Yorba*.

### 2. The PCR Analysis

 Morganti's second challenge involving the blood evidence pertains to a DNA analysis known as polymerase chain reaction or PCR. His objection to this evidence stems from the fact that PCR testing eliminated Paterson and Turner as possible sources of the bloodstain found on the door chain and identified Morganti as someone whose genetic traits were consistent with that stain.

PCR is "a molecular biology technical procedure for exploiting genetic differences in DNA," whereby small pieces of DNA are copied or amplified. The technique is employed when the DNA sample available is too small and/or degraded to perform a more common type of DNA analysis known as RFLP.

The PCR analysis performed in this case was used to amplify a specific gene known as the DQ alpha. The DQ alpha gene codes for proteins found on the surface of the white blood cell and is known to have alternate genetic forms, i.e., the gene does not look the same in all people. Six variations (or alleles) have been identified and labeled as 1.1, 1.2, 1.3, 2, 3 and 4. Because alleles are inherited in pairs, one from each parent, there are twenty-one possible combinations which are referred to as genotypes.

In the forensic setting, PCR analysis of DQ alpha involves three general steps. First, DNA is extracted from the nucleus of cells present in an unknown bloodstain. Second, the DQ Alpha is replicated or amplified by a process which involves combining the DNA with a commercially available solution or "cocktail"[9] and then subjecting the solution to a series of controlled temperature cycles. Finally, the amplified gene is typed in order to identify the alleles present in the amplified DNA.

---

[9]The cocktail is included as part of the "AmpliType Kit" a product created by Cetus Corporation (hereafter the Kit). The Kit also includes a "User's Guide" which outlines the procedures to follow when conducting PCR testing of DQ alpha.

### a. *Prong One—General Acceptance*

#### (i) *Standard of review*

Unlike agglutination inhibition testing, PCR has not been approved in published appellate precedent in California. The trial court in this case held a lengthy and extensive *Kelly* hearing and concluded that the PCR evidence was admissible. ■ This court has previously recognized that, for purposes of appellate review, " 'general acceptance' is best described as a mixed question of law and fact subject to limited de novo review." (*People* v. *Reilly* (1987) 196 Cal.App.3d 1127, 1134 [242 Cal.Rptr. 496].) "[W]e review the trial court's determination with deference to any and all supportable findings of 'historical' fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance." (*Id.* at p. 1135.)

In reviewing the literature contained in the record, we will not "pick and choose" among writings but will consider "a fair overview of the literature" to determine whether scientific consensus exists."[10] (*People* v. *Shirley* (1982) 31 Cal.3d 18, 56 [181 Cal.Rptr. 243, 723 P.2d 1354].) Further, we are mindful that "selected publications is a poor substitute for the testimony of several experts subject to cross-examination and judicial questioning as to the degree of general acceptance." (*People* v. *Taylor* (1995) 33 Cal.App.4th 262, 269 [40 Cal.Rptr.2d 132].) It is also appropriate to "examine relevant decisions from other jurisdictions on the question of consensus [citation], bearing in mind that the needed consensus is that of scientists, not courts." (*People* v. *Reilly, supra*, 196 Cal.App.3d at p. 1135.)

#### (ii) *The record*

■ In ruling that PCR analysis of the DQ alpha gene is generally accepted in the relevant scientific field, the trial court relied on expert testimony of two witnesses and extensive documentary evidence. The court found there is no significant controversy or dispute with respect to the reliability of this method and that the evidence did not indicate any flaw in the method or its use. Our review of the record confirms these findings.

---

[10]The case law is unclear as to whether our review of the scientific technique in question is confined to the record. (See, e.g., *People* v. *Reilly, supra*, 196 Cal.App.3d at pp. 1134-1135.) Indeed, the People in this case have provided us with references to outside literature but have not "urged" us to consult them. Since ". . . a court should ordinarily confine itself to the record on matters of a highly complex nature" (*id.* at p. 1135), we have not consulted outside literature in this case.

Morganti contends that the prosecution's experts did not establish general acceptance because they were disagreed with by "Dr. Grunbaum, the FBI and others." Two forensic serologists, Dr. Edward Blake and Gary Harmor, testified on behalf of the People that PCR analysis of DQ alpha is generally accepted as reliable in the scientific community.[11] The only witness who challenged Blake's and Harmor's opinion was Dr. Grunbaum. Grunbaum conceded that PCR analysis is generally accepted among scientists and that it will become the method of choice in DNA analysis, but opined that PCR analysis *of DQ alpha* is not generally accepted in the scientific community as a reliable *forensic* tool.[12] The trial court accorded little weight to Grunbaum's opinion because he (1) lacked sufficient hands-on experience,[13] (2) lacked credibility because of his bias toward Mr. Harmor, and (3) expressed opinions and criticisms which were unsupported by reason or lacked foundation.[14] This ruling was proper: "[O]pposition by persons minimally qualified to state an authoritative opinion is of little value . . . ." (*People* v. *Leahy*, *supra*, 8 Cal.4th at p. 612.)

Further, we find no evidence in this record to support Morganti's contention that the FBI disagreed with the prosecution's experts. Indeed, articles prepared by FBI employees and admitted into evidence in this case establish that the FBI has accepted this method for forensic use. (See, e.g., Comey et al., *Validation Studies on the Analysis of HLA DQa Locus Using the Polymerase Chain Reaction* (Nov. 1991) J. Forensic Sci. 1633 ["typing of the DQa gene by PCR and detection of specific alleles can be accomplished,

[11]Blake testified that he was not aware of any scientists who work in this field or of any publications expressing the view that PCR analysis is unreliable. He also testified there are no publications which characterize as unsound the statistical data associated with PCR analysis of DQ alpha. Similarly, Harmor testified he had not read any publications which criticize PCR analysis of DQ alpha as flawed or unreliable. And he was not aware of any criticism of the statistical data he used.

[12]Grunbaum conceded the test could be useful to the extent it can exclude an individual as a possible donor but condemned its use as a method of identifying a potential donor. According to Grunbaum the test is not reliable because there is a significant likelihood of contamination leading to an inaccurate result and, even if contamination does not occur, the analysis is not sufficiently discriminating to be probative. As discussed *ante*, the quality of the testing performed in a particular case is an issue relevant to weight not admissibility. (*People* v. *Farmer*, *supra*, 47 Cal.3d at p. 913.) Further, probative value is a different issue from reliability.

[13]Grunbaum has never done forensic case work on evidence using PCR analysis of DQ alpha, never written any article or lectured on PCR or RFLP, and never received training to use the Kit.

[14]Grunbaum was extremely hostile toward Harmor, testifying that Harmor did not "follow any protocol whatsoever," that his work was "experimentation" and "hit and run kind of analysis," and that his results were not reliable either "scientifically or unscientifically." Grunbaum accused Mr. Harmor of having a "system of laundering results," of knowingly falsifying his results, and concluded that there was not a "shred of reliable evidence" in this case because everything Mr. Harmor did was unreasonable.

when the typing is done using proper protocols, without producing false positive or false negative results"]; Comey et al., *PCR Amplification and Typing of the HLA DQa Gene in Forensic Samples* (Mar. 1993) J. Forensic Sci. 248 ["This study provides additional support that the HLA DQa typing procedure is a valid procedure for typing forensic samples."]; Letter from J. Kearney, Section Chief of Forensic Science Research and Training Center of the FBI to K. Burgermyer (Jan. 27, 1993) p. 1 ["[R]eliable results can be obtained from this test when performed by analysts trained in the performance and interpretation of the method."].)[15]

Morganti also contends the documentary evidence establishes "less than full acceptance of the use of PCR in forensic testing, particularly in regard to criminal cases involving unknown blood on contaminated objects."[16] ■ As our Supreme Court has recently confirmed, *Kelly* does not demand absolute unanimity of views in the scientific community. (*People* v. *Leahy*, *supra*, 8 Cal.4th at pp. 611-612.) " '[I]f a fair overview of the literature discloses that scientists significant either in number or expertise publicly oppose [the technique] as unreliable, the court may safely conclude there is no such consensus at the present time.' " (*Id.* at p. 611, quoting *People* v. *Shirley*, *supra*, 31 Cal.3d at p. 56.) ■ Our review of the literature in this record confirms there is no such significant public opposition.[17]

---

[15]Morganti contends that a March 1993 article prepared by the FBI warns that "DQ alpha must not be used by itself, but only as an adjunct to other DNA methods." The record citation Morganti provides for this proposition is Dr. Grunbaum's testimony to that effect. Literature in this record that was generated by the FBI simply does not support Grunbaum's contention. Apparently Grunbaum misinterpreted a conclusion in one article that "With proper care in interpretation, the HLA-DQa typing system should serve well as an adjunct to other DNA typing methods." (Comey et al., *PCR Amplification and Typing of the HLA DQa Gene in Forensic Samples*, *supra*, J. Forensic Sci., at p. 248.) This conclusion was drawn not because PCR is unreliable by itself but because this type of testing can often be successfully performed when RFLP analysis cannot. (*Ibid.*)

[16]One such article upon which Morganti specifically relies is: National Research Counsel, DNA Technology in Forensic Science (1992) (the NRC Report). Apparently Morganti has overlooked the following committee statement found at the beginning of the NRC Report: "We recommend that the use of DNA analysis for forensic purposes, including the resolution of both criminal and civil cases, be continued while improvements and changes suggested in this report are being made. There is no need for a general moratorium on the use of the results of DNA typing either in investigation or in the courts."

[17]Morganti emphasizes that Blake admitted during cross-examination that in prior cases experts have sometimes opposed his views with respect to PCR analysis. However, the record does not disclose the bases for that opposition or whether the opposing individuals views have changed in light of recent advancements. The mere fact that members of the relevant scientific community have testified against admitting PCR evidence in the past does not discredit the evidence in the present record that PCR analysis is generally accepted as reliable in the relevant community.

### (iii) *Judicial decisions*

PCR evidence has not been found admissible under *Kelly* in published California appellate precedent.[18] But courts in other jurisdictions have concluded that PCR analysis of DQ alpha is generally accepted as reliable in the scientific community. (See *Spencer* v. *Com.* (1990) 240 Va. 78 [393 S.E.2d 609, 620]; *State* v. *Gentry* (1995) 125 Wn.2d 570 [888 P.2d 1105, 1117-1118]; *State* v. *Russell* (Wash. 1994) 882 P.2d 747, 759-769; *State* v. *Moore* (1994) 268 Mont. 20 [885 P.2d 457, 474-475], disapproved on other grounds in *State* v. *Gollehon* (Mont. 1995) 906 P.2d 697, 700-701; *Seritt* v. *State* (Ala.App. 1994) 647 So.2d 1, 3-5; *State* v. *Williams* (1991) 252 N.J. Super. 369 [599 A.2d 960, 967]; *People* v. *Lee* (1995) 537 N.W.2d 233, 248-258]; *People* v. *McMillan* (1995) 213 Mich.App. 134 [539 N.W.2d 553]; *State* v. *Hoff* (Mo.Ct.App. 1995) 904 S.W.2d 56, 58-59; see also *Clarke* v. *State* (Tex.Ct.App.1991) 813 S.W.2d 654, 655; *Campbell* v. *State* (Tex.Crim.App. 1995) 910 S.W.2d 475, 478-479.)[19]

### b. *Prong Two—Witness Qualifications*

Morganti contends that Blake's and Harmor's expert testimony does not establish general acceptance because they are not impartial scientists. According to Morganti, both men have profit-making businesses which would be adversely affected if PCR analysis is not accepted as legitimate courtroom evidence. In addition, Morganti contends that Harmor, even if he is considered impartial, is not qualified to give an expert opinion as to the reliability of PCR analysis.

Dr. Blake is a forensic serologist with a doctorate in criminology and forensic science. He has performed PCR analysis of DNA thousands of times and has testified about this procedure in court 30-40 times. Indeed, Morganti concedes Dr. Blake has "true credentials." Gary Harmor began doing case work using PCR in January 1991 and has performed PCR analysis of DQ alpha 160-170 times. His work involves consulting with and offering advice to others in the field about PCR analysis of DQ alpha. Harmor has attended seminars and workshops about this scientific technique, and has participated in blind trials of the technique. Harmor has testified in 10 criminal cases in which PCR analysis was used.

---

[18]After briefing in this case was complete, the Supreme Court granted review in *People* v. *Amundson* (1995) 48 Cal.App.4th 788 [41 Cal.Rptr.2d 127] review granted August 10, 1995 (S047242), reprinted to permit tracking pending review, 39 Cal.App.4th 468, a case which was extensively discussed and relied on in the People's brief.

[19]Without record reference, Morganti refers to two unpublished superior court decisions wherein the courts excluded PCR evidence, People v. Martinez (1989), and People v. Mack (1990). Because we do not find these opinions in the record, we have not considered them.

This court has previously recognized that " 'a certain degree of "interest" must be tolerated if scientists familiar with the theory and practice of a new technique are to testify at all. [Citations.]' " (*People* v. *Reilly, supra,* 196 Cal.App.3d at p. 1140.) The trial court found insufficient evidence that Blake or Harmor was interested and concluded that both qualified as experts. We find no reason to disturb either of these rulings.

### c. *Prong Three—Correct Scientific Procedures*

Morganti contends Harmor did not use correct scientific procedures. Many of his complaints challenge the quality of the testing rather than the correctness of the procedure used. ▮ " '[T]he *Kelly/Frye* rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied. [Citation.] Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony.' [Citation.] 'Once the court acts within its discretion and finds the witness qualified, as it did in this case, the weight to be given the testimony is for the jury to decide.' [Citation.]" (*People* v. *Cooper, supra,* 53 Cal.3d at p. 814.)

▮ Accordingly, we focus on the correctness of the procedures that were used as opposed to the quality of the analyst's performance of those procedures. The Kit which was developed by Cetus Corporation to conduct PCR analysis of DQ alpha (see fn. 10, *ante*) contains a "User's Guide" which was admitted into evidence in this case. Seri uses the Kit to do PCR testing. Both Blake and the FBI have used the Kit as well, and both approve of its use. Blake and Harmor both testified that the User's Guide contains the correct scientific procedures for conducting PCR analysis of DQ alpha. We have not been apprised of, nor do we find, any contrary evidence in this record. Harmor testified that he followed the procedure set forth in the User's Guide. Dr. Blake testified that he reviewed Harmor's work and that Harmor used scientifically correct procedures.

Morganti contends that, even if the User's Guide is scientifically correct, the procedure in this case was incorrect because Harmor (1) added extra TAQ enzyme to the bloodstain sample which was removed from the door chain at the crime scene after that sample failed to amplify, and (2) did not perform a "substrate" control for the door chain.

### (i) *The additional TAQ*

The only technique Harmor employed that was not set forth in the User's Guide was the addition of extra "TAQ enzyme" when certain samples (such

as the door chain sample) did not amplify. Harmor explained that, once DNA is extracted from a sample, it is added to a "cocktail" which comes in the Kit and then subjected to a series of procedures designed to cause amplification of the DNA. One reason the sample may not amplify is because "the stain itself has inhibitory substances present in it which cause either the TAQ enzyme not to function in the cocktail or block the DNA for the TAQ enzyme to actually copy the DNA." Harmor testified that, when the sample does not amplify, the analyst is faced with a choice: "At that point the analyst can assess whether or not it's worth another try on the evidence. Frequently bloodstains inhibit the PCR process. I believe the literature says it's because of the possibility of the E molecule interfering with the attachment of the TAQ enzyme onto the DNA primer and single strand. [¶] So, to overcome that, one analyst can dilute the sample, reduce the volume of sample added to the cocktail which would also reduce the amount of inhibitory substance and/or add additional TAQ enzyme which is purchased from Perkin-Elmer Corporation. This in effect would absorb the inhibitory substance, leave TAQ left over to copy the DNA."

Morganti has identified no evidence, other than Grunbaum's discredited testimony, that questions the correctness of Harmor's retesting procedure. Although adding the TAQ enzyme to overcome inhibition is not prescribed in the User's Guide, taking such a step is not inconsistent with the procedures contained therein. Harmor testified that adding extra TAQ is an acceptable practice. Further, Blake testified that adding the TAQ is a "fairly standard strategy for overcoming inhibition difficulties," that it is discussed in the literature and is an acceptable, reliable methodology for amplification.

(ii) *The substrate control*

A substrate control is a PCR test performed on an unstained portion of the material from which bloodstain evidence is removed. The control is processed along with the stain evidence and tests "for any other stains that might not be visible that are present in the fabric or any interference the fabric might have with the actual PCR process and typing." Although Harmor always tries to obtain a substrate control, it is not unusual to be presented with evidence from which it is not possible to obtain one. The absence of such a control does not prohibit or affect the way he reports the results of the PCR analysis itself. In the present case, Harmor tried but was unable to perform a substrate control on the door chain because everywhere he tested on the chain turned out to be positive for blood.

Morganti identifies no evidence in this record to support the conclusion that the absence of a substrate control renders unreliable the procedure used

to conduct a PCR analysis on bloodstain evidence. Indeed, Blake testified the controls were adequate. In our view, the absence of such a control like the use of the retesting technique to overcome inhibition, may affect the weight but not the admissibility of the challenged evidence.

We conclude that the scientific technique of PCR analysis of the DQ alpha gene is generally accepted in the relevant scientific community and that correct scientific procedures were employed to conduct that analysis in the present case. Morganti's remaining objection to admission of the DNA evidence pertains to the distinct issue of statistics.

### 3. *Statistics*

Once the PCR analysis is complete, there may or may not be a need to perform a statistical analysis. If the subject of the investigation is not compatible with the blood evidence, statistics or genetic frequency data is irrelevant. If the person has the same traits as the evidentiary specimen, then the question is how common or rare are those traits, i.e., what percentage of the population are potential donors of such a specimen. The People mistakenly contend that PCR statistical evidence is not subject to the *Kelly* analysis. "*Kelly*'s test of general acceptance in the scientific community applies not only to the techniques for laboratory analysis of the DNA material but also to the statistical calculations which indicate the likelihood that the crime scene sample of DNA would match with some individual other than the defendant." (*People* v. *Taylor*, *supra*, 33 Cal.App.4th at p. 266; see also *People* v. *Barney*, *supra*, 8 Cal.App.4th at p. 818.)

The PCR results in this case established that Paterson and the victim were not compatible with being sources of bloodstains found on the door chain at the crime scene, but that Morganti did have the same traits as the evidentiary specimen. Harmor used genetic frequency data to conclude that slightly over 4.5 percent or one in twenty-two people in the Caucasian population had the same traits as the evidentiary specimen. Morganti questions the reliability of this statistical conclusion.

Morganti contends that the statistical evidence should have been excluded because, at the time of the *Kelly* hearing, there was a major dispute in the scientific community as to the application of statistics to any DNA test results. According to Morganti this lack of general acceptance was acknowledged by Division Three of this court in *People* v. *Barney*, *supra*, 8 Cal.App.4th 798. We disagree. As the court below recognized, applying statistics to PCR test results presents a fundamentally different issue from the controversy involving RFLP testing that was discussed in *People* v.

*Barney.* As the trial court explained: "Each method includes a substantially different basis for determining population frequencies. [¶] The RFLP method is considerably more discriminating than PCR, and the result being statistics considerably more significant under the RFLP method. [¶] As an illustration, in the *Howard* case, which was part of the decision in *Barney-Howard,* the DNA pattern indicated a frequency of one in two hundred million people in the black population. [¶] Here, by comparison, under the PCR method, for a 1.2,4 allele, the percentage frequency is 10.4 percent. In the rarest situation, that of a 1.3, 1.3 allele, the frequency is 1.2 percent of Caucasians and these are taken from tab 5 . . . of the Cetus AmpliType users guide that is in evidence. [¶] Also, there is a significant difference as to the data base. And in the projections that are utilized in the two systems, or elements of frequency data for RFLP, it is indicated from the Howard case, that the data base was comprised of three hundred persons at various locations, with really extraordinary genetic projections in millions of people in different populations. Here the data base, the frequency are from samples observed and a percentage only is given. [¶] Eliminated from the—this element in the PCR method is what this court perceives to be an unusual amount of speculation or conjecture when you attempt to project in the millions of people of certain classes as in RFLP method. That simply isn't present under the PCR method with the protocol set forth in the AmpliType User's Guide. [¶] The—and also unlike the *Barney-Howard* case, here there is no need to consider substructures or further breakdown of population genetics. [¶] The frequency data under PCR as testified by Dr. Blake is but an estimate."

The distinctions the trial court drew between RFLP and PCR statistics are amply supported by the record, especially in the testimony of Dr. Blake. The trial court also correctly observed that, in contrast to *People* v. *Barney,* no published literature or credible evidence was introduced into this record indicating any flaw or controversy with respect to the population frequency data used to evaluate PCR test results. The undisputed testimony of both Harmor and Blake establishes that no such controversy exists.

Morganti contends that the absence of general acceptance of the statistical analysis of PCR results is established by the fact that Blake's statistical conclusions were not identical to Harmor's.[20] Dr. Blake expressed only minor disagreement with Harmor's ultimate conclusions. He did not question the reliability of the statistical analysis itself or the correctness of Harmor's procedures.

---

[20]He attempts to further muddy the waters by contending that Grunbaum's testimony establishes that the FBI would have offered yet a third conclusion had it been asked to analyze the evidence in this case. The FBI did not testify and we will not use Grunbaum's testimony to speculate as to what their conclusions might have been. But we do note that Grunbaum actually admitted that Harmor used the "correct" statistical data to draw his conclusions.

### 4. Conclusions Regarding Admissibility of Blood Evidence

We affirm the trial court's findings that both agglutination inhibition and PCR analysis of the DQ alpha gene are generally accepted as reliable techniques by the relevant scientific community. We also affirm the court's discretionary rulings regarding relevancy, witness credibility and expert qualifications. Finally, we affirm that correct scientific procedures were used to conduct the agglutination inhibition and PCR tests in this case. Therefore, evidence pertaining to these tests was properly admitted.

### B. Mario Morganti's Testimony*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. The Separate Trial Motions

██ Morganti made several motions, all of which the trial court denied, contending that he was entitled to be tried separately from Paterson.[24] Morganti challenges those rulings and contends the joint trial deprived him of due process. According to Morganti, this is a rare case in which the codefendants' antagonistic defenses compelled severance. We disagree.

### 1. The Trial Court's Discretion

The trial court recognized that Morganti and Paterson had conflicting and antagonistic defenses but concluded that Morganti failed to present "sufficient evidence to raise the prejudice element to a level that warrants separate trials." ██ We review the court's rulings on the motions for separate trials for abuse of discretion. (*People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669] (hereafter *Turner*), overruled on another ground in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1149 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 167 [5 Cal.Rptr.2d 796,

---

*See footnote, *ante*, page 643.

[24]Morganti first moved for separate trials in July of 1992 alleging that an incriminating statement Paterson gave to investigators implicated Morganti in the homicide. The prosecution opposed severance, stating it did not intend to use Paterson's statement at trial. Morganti then supplemented his motion alleging conflicting defenses and the potential for prejudice based on association. After a hearing, the court denied this motion. In March of 1993, Morganti filed a second motion for separate trials alleging conflicting defenses. The court granted Morganti's request for an in camera hearing during which Morganti revealed his defense theory in an effort to convince the court that it so conflicted with Paterson's theory so as to require severance. Following that hearing, the court denied Morganti's second motion. After the jury began hearing evidence, Morganti made two additional motions to sever his trial from Paterson's. The trial court denied the first of these motions and, apparently, did not rule on the second.

825 P.2d 781] (hereafter *Hardy*).) Whether that discretion was abused "must be decided on the facts as they appear at the time of the hearing on the motion rather than on what subsequently develops." (*Turner, supra*, 37 Cal.3d at p. 312.)

██ The trial court did not abuse its discretion by refusing to grant Morganti a separate trial. The court's rulings were consistent with California's statutory preference in favor of joint trials. (Pen. Code, § 1098; see also *Hardy, supra*, 2 Cal.4th at p. 167; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 932 [4 Cal.Rptr.2d 765, 824 P.2d 571].) This preference was enhanced by two provisions of Proposition 115 adopted at the June 1990 election. (See 5 Witkin & Epstein, Cal. Criminal Law (1995 supp.) Trial, § 2518, p. 34.)[25] Further, the present case, which involved defendants charged with common crimes involving common events and victims, fits within the Supreme Court's definition of a "classic case" for a joint trial. (*Hardy, supra*, 2 Cal.4th at p. 168; *Turner, supra*, 37 Cal.3d at p. 312.)

According to Morganti, he was entitled to a separate trial because he and Paterson had conflicting and antagonistic defenses. The trial court acknowledged this fact. However, as the trial court also recognized, such a circumstance does not—standing alone—entitle the defendants to separate trials. " 'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on that basis.*' [Citation.] If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' [Citation.]" (*Hardy, supra*, 2 Cal.4th at p. 168.)

2. *Due Process*

Although Morganti provides us with no reason to question the trial court's rulings, his due process challenge is based on an event which occurred after his motions were denied. ██ Even when denial of a severance motion was not an abuse of discretion, "the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of the law. [Citation.]" (*Turner, supra*, 37 Cal.3d at p. 313; accord, *People* v. *Bean* (1988) 46 Cal.3d 919, 940 [251 Cal.Rptr. 467, 760 P.2d 996].)

---

[25]Article I, section 30, subdivision (a) of the California Constitution provides that the state Constitution "shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature or by the people through the initiative process." Section 1050.1 of the Penal Code implements this provision.

Morganti directs our attention to the following comment made during Paterson's counsel's closing argument: "I think the evidence in this case shows no doubt that Mr. Morganti committed the crime of murder, and arson, in Cloverdale. The evidence also shows in this case that George Paterson had knowledge of that murder, that he is guilty as an accessory after the fact. He didn't tell the police, he didn't turn over the car, he lied to Al Carusillo, he protected himself. He protected Mr. Morganti. That is an accessory after the fact, ladies and gentlemen. That's what the evidence shows in this case." Morganti contends this "concession" by Paterson's counsel illustrates that the mutual antagonism was so extreme in this case that the joint trial deprived him of due process. We disagree.

In *Turner*, codefendants were tried on two counts of murder committed during commission of a burglary. (*Turner, supra,* 37 Cal.3d 302.) Only one defendant testified at trial. He admitted that he and appellant were about to commit a burglary when he became frightened and ran away. He returned to the scene after hearing gunshots and then participated in further criminal activity only because he was ordered to do so by appellant who pointed a gun at him. (*Id.* at p. 310.) Both defendants were convicted of murder. Appellant contended he was entitled to a separate trial because his codefendant's testimony conflicted with his defense and was "gravely prejudicial." (*Id.* at p. 312.)

The *Turner* court first held that the trial court did not abuse its discretion by consolidating the two cases for trial because ". . . at the time of the motion to consolidate, the court was faced with two men charged with murders under circumstances in which all the events surrounding the crimes and ultimate arrests involved them jointly." (*Turner, supra,* 37 Cal.3d at p. 313.) The fact that the prosecution would be in a position to put on its case "then sit back and watch as defense counsel became the real adversaries" did not warrant separate trials. (*Id.* at p. 312.) The *Turner* court also found that the testimony by appellant's codefendant did not result in a denial of due process: "[N]o denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution." (*Id.* at p. 313.)

*Turner* is indistinguishable from the present case in any way that might benefit Morganti. The argument by Paterson's counsel, which was after all only argument and not evidence, was certainly no more antagonistic than the damaging testimony by appellant's codefendant in *Turner*. (See *People* v. *Pinholster, supra,* 1 Cal.4th at p. 934.) Thus, *Turner* establishes there was no due process violation in this case.

Morganti does not discuss *Turner*, but relies instead on the following passage from *Hardy*: "Moreover, although it appears no California case has discussed at length what constitutes an 'antagonistic defense,' the federal courts have almost uniformly construed that doctrine very narrowly. Thus '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' [Citation.] 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' [Citations.] Stated another way, ' "mutual antagonism" ' only exists where the acceptance of one party's defense will preclude the acquittal of the other.' [Citations.]" (*Hardy, supra,* 2 Cal.4th at p. 168.)

Morganti characterizes Paterson's defense as conceding guilt as an accessory after the fact to the murder committed by Morganti and he contends that the jury's acceptance of that defense precluded acquittal of Morganti. Focusing only on the last sentence of the above quoted passage, Morganti contends *Hardy* mandates reversal. We disagree. Although *Hardy* contains a rather cursory summary of the holdings of a few federal cases, we do not interpret *Hardy* as adopting those holdings or as intending to provide a definitive definition of an antagonistic defense which *requires* severance.[26]

More important, *Hardy* recognizes that the existence of conflicting or antagonistic defenses does not compel separate trials. (*Hardy, supra,* 2 Cal.4th at p. 168.) Indeed, the court made the following observation: "As the Supreme Court of Kentucky opined: '[N]either antagonistic defenses nor the fact that . . . one defendant incriminates the other amounts, by itself, to unfair prejudice. . . . That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than *against* a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together.' " (*Id.* at p. 169, fn. 19, quoting *Ware* v. *Commonwealth* (Ky. 1976) 537 S.W.2d 174, 177, quoted in

---

[26]Admittedly, the passage from *Hardy* upon which Morganti relies is confusing. For example, the last sentence of that passage—that mutual antagonism exits where the acceptance of one party's defense will preclude acquittal of the other—is not "another way" of stating the principle in the preceding sentence—that the conflict is so prejudicial and the defenses so reconcilable that the jury will unjustifiably infer that the *conflict alone* demonstrates both are guilty. Indeed, the two sentences are inconsistent, the earlier one requiring that the jury find both defendants guilty and the later contemplating that one defense will be accepted to the preclusion of the other. However, because we do not interpret the above quoted passage as setting forth any definitive rule, we find it unnecessary to resolve the inconsistencies we find in it.

Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices* (1979) 77 Mich. L.Rev. 1379, 1423.)

Further, the *Hardy* court affirmed the denial of appellant's motion for severance. (*Hardy, supra,* 2 Cal.4th at pp. 168-171.) At trial, all three *Hardy* defendants denied culpability for the murders and speculated that one or both of the other defendants was responsible. (*Id.* at p. 168.) "Each defendant presented a theory of the case that absolved himself of guilt and focused blame on the others. The jury was thus presented with a straightforward choice regarding the credibility of the various defendants." Despite conflicting defenses, the *Hardy* court concluded the trial court did not abuse its discretion by denying appellant's motion to sever and that appellant's federal due process rights were not violated. (*Id.* at pp. 169-171.)

Morganti contends the conflict in this case was more serious than in *Hardy* because Paterson's counsel's concession was tantamount to a confession and necessarily implicated Morganti in the murder. Morganti's counsel elaborated on this contention at oral argument by suggesting that the statement by Paterson's counsel deprived him of his constitutional right to confront witnesses against him because Paterson's counsel could not be cross-examined. Apparently counsel has mistaken argument for evidence. The closing argument by Paterson's counsel was not a confession; it was not even evidence. Thus Paterson's counsel was not a witness who Morganti was entitled to confront. Further, the challenged argument was not Paterson's defense but rather an attempt to deal with the evidence that was presented by the prosecution. Paterson's defense was that he did not commit or participate in the murder. Indeed, Morganti does not identify any evidence presented by Paterson which implicated Morganti in any way.

■ Finally, even when a motion to sever is erroneously denied, reversal is required only if it is "reasonably probable that [the defendant] would have obtained a more favorable verdict at a separate trial." (*People* v. *Massie* (1967) 66 Cal.2d 899, 923-924 [59 Cal.Rptr. 733, 428 P.2d 869].) ■ Of course, Morganti contends such a reasonable probability exists, but his contention is not supported by persuasive reasoning. Apparently Morganti believes that he could have convinced a jury that Paterson murdered Turner by admitting into evidence a statement Paterson gave police denying responsibility for the murder and implicating Morganti. Morganti contends that if he had been granted a separate trial he could have used Paterson's hearsay statement (which was not offered by the prosecution in this case) to prove Paterson lacked credibility and was therefore the more likely murderer. We are not persuaded by this strained logic.

D.-G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is affirmed.

Smith, Acting P. J., and Phelan, J., concurred.

A petition for a rehearing was denied March 27, 1996, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 22, 1996. Chin, J., was of the opinion that the petition should be granted.

*See footnote, *ante,* page 643.