108 Cal.Rptr.2d 76 (2001)
89 Cal.App.4th 1139
The PEOPLE, Plaintiff and Respondent,
v.
Robert Charles TILLETT et al., Defendants and Appellants.
No. G025414.
Court of Appeal, Fourth District, Division Three.
June 8, 2001.
Review Denied September 12, 2001.[**]
*79 Carl Fabian, San Diego, under appointment by the Court of Appeal, for Defendant and Appellant Robert Charles Tillett.
Shulman, Shulman & Siegel and Corinne S. Shulman, Hydesville, under appointment *80 by the Court of Appeal, for Defendant and Appellant Ron Simmons.
Terrence Verson Scott, Los Angeles, under appointment by the Court of Appeal, for Defendant and Appellant Edwin Kizzee.
Stuart A. Skelton, San Diego, under appointment by the Court of Appeal, for Defendant and Appellant Tramaine Howard Cooper.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and Maxine P. Cutler, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
SILLS, P.J.
Robert Charles Tillett, Ron Simmons, Edwin Kizzee and Tramaine Howard Cooper appeal from the judgments sending them to prison for extended stays[1] after a jury convicted them of a string of charges and enhancements arising from their livelihood of choice: gang-related crime. Sharing common threads, the arguments raised by each are joined in by the others, such as challenging the sufficiency of evidence to support the gang enhancements, the joinder of all the charges, and the prosecution's amending the information after the defendants had waived a preliminary hearing. Kizzee argues the trial court abused its discretion when it failed to either grant a mistrial or exclude expert testimony of deoxyribonucleic acid (DNA) profiling and comparison as a sanction for the prosecution's failure to divulge potentially exculpatory evidence. He also contends the court erred in its instructions which defined terms in the gang enhancements and in its sentencing scheme, which imposed terms for both the gang enhancement and the use of a gun without a specific finding by the jury. We affirm the four judgments, excepting the terms for the gun enhancements under Penal Code section 12022.53, subdivisions (b) and (c), which are reversed, thus requiring us to remand the case for resentencing.[2]

I

FACTS
Tillett, Simmons, Kizzee and Cooper spin quite a yarn in their appeal. They were four members of several subgroups *81 of the Crips criminal street gang.[3] After stealing a car, Simmons and Kizzee entered a jewelry store on May 12, 1998 along with an unidentified third suspect and pulled a gun on the owner, an employee, two customers and a Federal Express courier, who was unlucky enough to have delivered a parcel at the very moment of the robbery. The robbers hog-tied all of those present in the shop before taking their money and jewelry, as well as clearing out the store's merchandise.[4] Kizzee was positively identified by Szabo, the owner. Moreover, a few drops of blood were found on a box left on a display case, which were later matched to Kizzee through DNA comparison by Dr. Ruth Ikeda. Simmons was positively identified by a witness outside the store who had noticed their car, and whose curiosity was aroused: It was parked in a "handicapped" parking space with the driver still in it, who did not appear handicapped.[5]
Following this same pattern, a white Cadillac was stolen a month later in Long Beach. Soon after, all four of the defendants entered another jewelry store and robbed the owner, his wife, two salesclerks and a visiting jewelry dealer at gunpoint. The women were hog-tied, and then the display cases were emptied by the robbers, who got away with about $150,000 worth of jewelry. The visiting dealer, Ron Ceresani, ran after the robbers, and when two of them fired at him, he returned their fire with the store owner's gun. A latex glove was found on the floor by the display cases, apparently removed and dropped by one of the robbers. Fingerprints lifted from the cases were identified as belonging to Tillett and Kizzee; both of them and Simmons were positively identified as the three robbers who initially entered, and Cooper was identified as the fourth suspect who entered the shop after the first three.[6]
At this point, the fabric of their criminal lives started to unravel. News of the robbery and the white Cadillac was broadcast over police radio, and a California Highway Patrolman, Patrick Goodman, who happened to be in the area, saw a white Cadillac, speeding away from the robbery's reported location. He followed it. When the Cadillac stopped, Goodman saw Cooper and Tillett get out, nonchalantly put handguns into their waistbands, and then walk towards the entrance to a Mervyn's store. Kizzee and Simmons followed them. Another officer, Alexander Bancroft, was listening to the police radio in his car, parked in the same parking lot, and saw Simmons and Cooper leave Mervyn's a few minutes later and enter Joann's Fabrics.
*82 Simmons and Cooper were seen inside the store, wrapping some jewelry into a piece of fabric. Although they tried to bolt from the fabric store, the cops sewed them up without further incident. A crime scene investigator later found two semiautomatic handguns stuck between some fabric, as well as some jewelry and watches nearby.
Meanwhile, Tillett and Kizzee left Mervyn's and approached a Ford Expedition driven by Debra Arriola. She was seated in the vehicle which was parked but still had the engine running. Tillett attempted to open Arriola's door; he then motioned for Arriola to roll down the window, but she refused. As she refused to open the van to the men, they walked towards another van parked nearby. The van belonged to Raymond Parker, who had already lowered the passenger-side window, although the engine was still running and the doors were locked. Kizzee and Tillett attempted to open the door but found it was locked. Kizzee reached in through the half-open window, lifted the lock, and ordered Parker out. When he did not respond, the men pulled a gun out, pointed it at him and shoved him out the driver's door.
Goodman, who still remained in the parking lot, heard the radio report from Bancroft that Kizzee and Tillett had escaped in a brown van. He gave chase. So did Bancroft. So did another officer, Michael Grimmond, who overheard the radio reports and joined in the parade. A citizen watching all this saw a gun being thrown from the van and retrieved it. Grimmond saw someone discard some latex gloves from the van as well. Eventually, the van came to a halt, and Tillett and Kizzee were taken into custody.
A pillowcase of jewelry boxes was found behind the Mervyn's store and was returned to the jewelry store owner. Small samples of blood were found on the armrest of the van. Dr. Ikeda used the polymerase chain reaction (PCR) process to perform a DNA comparison and concluded the samples from the van "matched" Tillett's blood.
Simmons was found to have a gold watch in his rear pocket. When the searching officer looked at it, expecting to find a tag from the jewelry store still attached, he expressed his surprise that it was missing. Simmons turned to him and said, "Do you think I'm a fool? I ate it." Alas, the truth of Simmons's statement is self-evident.
Search warrants were executed on the residences of the four defendants. All four of the defendants had photographs in their homes which depicted various persons with gang tattoos, gang hand signals, gang nicknames and gang apparel. In Cooper's bedroom, four photographs were found; in Simmons's place, three photographs were taken. Kizzee's place held five photographs and paperwork containing gang information. The search of Tillett's home produced a poem, employing gang phrases and topics, and a set of photographs, some of which held captions written on them.
Tillett was a walking advertisement for a tattoo parlor. He had "Foe" emblazoned on his right arm; he had the number "8" on his left arm. Together, they represented the 84th Street Crips gang. He had the tattoo, "Crimin," on his chest, short for his gang moniker of "Criminal." He also had "MSC"the abbreviation for Main Street Cripstattooed on his body. Simmons had a tattoo on his upper arm representing the name of the 59th Street and Hoover Crips. Kizzee had several tattoos: "Four," "trey," "Just Groovin," "In the struggle for survival," a picture of dice, an *83 "H" and a star.[7] He had referred to other Crips members as "homies" when found in their company several years before. Cooper had a gang nickname of "Big Coop," which was written on a photograph of him in a gang stance taken from his residence.
Los Angeles Police Department Detective Roger Magnuson testified as an expert in gang-related crime and behavior. He described the Crips as a criminal street gang which uses crime and the use of firearms to terrorize and intimidate. He testified that the Crips have many subgroups, some of which are quite friendly with one another, such as the Hoover and Main Street subsets. He described the gangs' hand signals, tattoos, clothing and habit of collecting specially posed photographs of each other. Based on the photographs, tattoos, nicknames and poem, Magnuson concluded Tillett was a lifetime member of the Crips, and specifically of the Hoover, Main Street and 84th Street subsets.[8] Similarly, he opined Cooper was a Crips member, particularly because certain photographs found in his possession were labeled "Crips." In Magnuson's experience, no gang member would send a photograph with the gang name on it to anyone who was not a fellow gang member. Kizzee was, in Magnuson's experience, a Crips member due to the numerous tattoos, as well as the photographs. Finally, Simmons was a gang member of one of the Crips sets in Magnuson's opinion, based on his tattoo and his keepsake photographs, especially the ones labeled with the Crips' name. He also had prior convictions in Arkansas, and, according to Magnuson, it was not uncommon for Crips gang members to journey from one state to another to commit crimes for the gang. Considering the four defendants' common relationship with the umbrella group of Crips, and their elevated status within that group by committing crimes outside their neighborhoods, Magnuson concluded the robberies were committed for the benefit of the gang.[9] The proceeds from both crimes would support the "gangster life," by "intimidating people. It goes to the heart and soul of gang, a gang member." Particularly noteworthy in his opinion was that Afro American gangs are "driven by money" and not by territory. Some Crips will even fight other Crips when necessary.

DISCUSSION

II

Sufficiency of Evidence
All four defendants contend the evidence is insufficient to support the 20-year terms they received for the enhancements, which alleged they personally discharged firearms during these crimes committed for the benefit of a criminal gang. Enhancements under Penal Code section 12022.53 apply to anyone convicted of robbery "who in the commission of that felony intentionally *84 and personally discharged a firearm[,] ..." provided the person is "charged as a principal in the commission of an offense that includes an allegation pursuant to this section when a violation of both this section and subdivision (b) of Section 186.22 [the gang-benefit enhancement] are pled and proved." (See Pen.Code, § 12022.53, subds. (c) & (e)(1).)[10] The gang-benefit enhancement found in section 186.22, subdivision (b) provides added penalties when a person is convicted "of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, ..." The defendants make the following attacks: (1) the Crips gang is too "amorphous" to qualify as a criminal street gang as defined in section 186.22; (2) the crime was indistinguishable from any other armed robbery committed in concert with other participants; (3) each defendant belonged to a separate group, thus, no one criminal street gang was named; (4) the evidence was insufficient to prove any of the defendants were active members of the Crips; (5) the evidence is insufficient to prove the requisite "predicate offenses;" and (6) expert testimony was erroneously received as to the motive for the crimes.
The standard on appeal for any attack on the sufficiency of evidence has been oft-repeated. We must view the evidence in the light most favorable to the judgment, drawing all reasonable deductions from the evidence in the judgment's favor. We must accept all assessments of credibility as made by the trier of fact, then determine if substantial evidence exists to support each element of the offense(s). (See People v. Carpenter (1997) 15 Cal.4th 312, 387, 63 Cal.Rptr.2d 1, 935 P.2d 708.)
A criminal street gang is defined in section 186.22, subdivision (f), as any "group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the [liste[11]] criminal acts ... having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." The defendants contend there is no commonality between their respective gang groups; thus, no gang relationship exists between them. They argue that there is no such thing as a "generic" Crips gang, out of which other, smaller gangs operate, and there is no evidence of either a structural hierarchy or interdependence between the groups represented by these four defendants. They note there are different hand signals for the Hoover group than there are for the Main Street or 84th Street gangs. They argue that many groups use the name Crips, but that does not impart a relationship with the Crips gang. Without evidence of a cohesive policy or leadership structure between these subgroups, they contend they are not related.
In essence, the defendants emphasize those selected pieces of evidence which support their argument but ignore the vast amount of testimony which supports the jury's verdict. Moreover, we reject their invitation to analogize the requirements of section 186.22 with the federal definitions of a criminal racketeering organization under RICO (Racketeer Influenced and Corrupt Organizations Act; 18 U.S.C. § 1961 et seq.). There is no authority to do so, and common sense rejects the argument.
To meet the statutory definition of a criminal street gang, evidence must exist *85 that the gang has "a common name or common identifying sign or symbol ... whose members ... engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) Magnuson testified each of the defendants aligned himself with at least one of the many divisions within the Crips gang. He also testified that within the Crips culture, it was common for members to form alliances, friendships and associations with other Crips groups. According to him, these subgroups were primarily neighborhood groupings of Crips members. Although some of the different subgroups had their own hand signals, all of the defendants had at least one photograph of themselves or their friends displaying the Crips hand signal: A letter "C" formed by one hand. As this element may be proven by expert testimony, the record sufficiently supports the jury's determination. (See People v. Gardeley (1996) 14 Cal.4th 605, 620, 59 Cal.Rptr.2d 356, 927 P.2d 713.)
The specific element of a common sign or symbol was discussed in the case, In re Nathaniel C. (1991) 228 Cal.App.3d 990, 279 Cal.Rptr. 236. The gang in that case was known by two names, Tongan Family and the Family. The issue was easily resolved because "[t]he association of multiple names with a gang satisfies the statute's requirement so long as at least one name is common to the gang's members." (Id. at p. 1001, 279 Cal.Rptr. 236.) Magnuson described the Crips gang as being the umbrella gang with which the smaller cliquessuch as the Hoovers, Main Street, 84th Street, 43rd Street subsetsidentified, but were not necessarily beholden. Some of the cliques used Crips in their name, but not all. However, Magnuson testified that if a gang member "hangs out with Clips, he is a Crip." According to the officer, a Crips gang member would never commit crimes with a non-Crip participant. Magnuson testified that each of the four defendants were Crips members even though they might each hang out with more than one of the different Crips cliques. Thus, evidence exists to support the jury's conclusion that all the different subgroups wereas opined by Magnusonmerely subgroups within the Crips gang, irrespective of the lack of a single or exclusive name, leader, cohesive policy, etc.
As to the next element required to prove a criminal street gang, to wit, engaging in a pattern of criminal gang activity, the prosecution must prove at least two or more offenses listed in section 186.22, subdivision (e), provided at least one of the offenses occurred within three years of the first crime. In proving these predicate offenses, the prosecution may use the charged offense and any offense committed by another gang member, including the same, charged offense. (People v. Loeun (1997) 17 Cal.4th 1, 9-10, 69 Cal.Rptr.2d 776, 947 P.2d 1313.) However, if the prosecution relies on the present offense as committed by two or more gang members to establish both predicate offenses, there must be two actual crimes committed. In other words, it is not sufficient for a gang member to commit a crime and another gang member to merely assist him in committing that one crime. (People v. Zermeno (1999) 21 Cal.4th 927, 931, 89 Cal.Rptr.2d 863, 986 P.2d 196.)
Here, the evidence presented to prove the string of charged offenses by four different gang members meets the requirements of "engaging in a pattern of criminal gang activity:" Four members of the Crips gang committed an auto theft and armed robberies of approximately five different people, not to mention the conspiracy to commit the robbery. If that wasn't enough, there was the "shoot-out" with Ceresani as well. The predicate-offense *86 requirement was met here by the present charges.
Assuming arguendo the evidence of the present set of crimes was somehow insufficient, records of the conviction of James Hall for assault with a deadly weapon in June 1998, and of the conviction of Tony Ellison for grand theft of an auto in December 1996 were admitted. Both Hall and Ellison were Crips members, according to Magnuson. Tillett objects to these records for two reasons: (1) a judgment cannot be used as proof of a prior conviction, citing People v. Wheeler (1992) 4 Cal.4th 284, 14 Cal.Rptr.2d 418, 841 P.2d 938; and (2) a judgment is hearsay evidence insufficient to prove predicate acts, citing In re Nathaniel C, supra, 228 Cal. App.3d at page 1003, 279 Cal.Rptr. 236. However, his reliance is sorely misplaced. Wheeler held that a judgment of a misdemeanor conviction is hearsay that cannot be used to prove the facts underlying that misdemeanor conviction to impeach a witness because there is no statutory authority to do such. There is statutory authority to permit the use of a felony conviction for purposes of impeachment, as well as authority to permit the use of court records to prove a judgment. (See Evid.Code, §§ 452, subd.(d); 788.)
Finally, Magnuson's expert opinion as to the membership status of each of the defendants was sufficient to sustain the verdicts. (See People v. Castenoda (2000) 23 Cal.4th 743, 747, 97 Cal.Rptr.2d 906, 3 P.3d 278.) Three of the defendants had at least one tattoo associated with at least one of the Crips gang's subgroups. All four of them had photographs in their possession of the distinctive gang variety: Young men standing in defiant gang fashion, dressed in Crips gang apparel, "throwing" Crips hand signals or standing around caskets of deceased fellow gang members. The signatures and autographs on those photographs also were distinctively of the Crips gang: "Stay up, Homie," "West Side Village Crips," "Trey," "HCG (for Hoover Crips Gang)," "C Hag," and "Crip for Life." Tillett even admitted his membership to authorities on three occasions, and Kizzee's girlfriend told the police Kizzee was presently a Crips member.
The defendants espouse that Magnuson improperly expressed an opinion on the ultimate issue of the case, citing Piscitelli v. Friedenberg (2001) 87 Cal.App.4th 953, 105 Cal.Rptr.2d 88.[12] However, the detective never stated his personal opinion as to their guilt or innocence; nor did he step into the shoes of some trier of fact, speculating as to the culpability determination of some quasi-judicial body, as did the expert in Piscitelli. On the contrary, Magnuson testified that the crimes were committed for the benefit of the gang based on his knowledge of the motivations behind this crime and its similarity with the motivations behind the Crips gang members, generally. Such an opinion was proper in light of the charges, and the fact that the average juror is not privy to the machinations in the average gangster's mind. (See People v. Valdez (1997) 58 Cal.App.4th 494, 507-508, 68 Cal.Rptr.2d 135; see 1 Witkin, Cal. Evidence (4th ed. 2000) Opinion Evidence § 89, pp. 635-636 ["`[I]n this state we have followed the modern tendency and have refused to hold that expert opinion is inadmissible merely because it coincides with an ultimate issue of fact.' (People v. Cole (1956) 47 Cal.2d 99, 105, 301 P.2d 854 ...)"].) The evidence was sufficient.

*87 III

Joinder and Amendment

A. Joinder
Simmons and Kizzee were charged with the robbery of Szabo's jewelry store in May 1998, but Cooper and Tillett were not, even though Cooper was positively identified as the driver of the getaway car. Nonetheless, the charges against Simmons and Kizzee for the May jewelry store robbery were joined in the same information with the charges against all four defendants for the June jewelry store robbery and the crimes committed during the subsequent pursuit. All four defendants contend the joinder of both crime sprees in the same pleading was error. Thus, they argue the motion to sever the two robberies and hold separate trials should have been granted. We disagree.
As a procedural measure, we note that all four defendants on appeal join in each other's arguments. However, only Cooper raised a motion to sever in the trial court, which Tillett and Simmons then joined. Cooper renewed his motion to sever during trial, and Tillett similarly joined in the motion. Kizzee never joined in the motion to sever at trial, and therefore waived the issue for appeal purposes. (People v. Miranda (1987) 44 Cal.3d 57, 77-78, 241 Cal.Rptr. 594, 744 P.2d 1127.)
The Legislature prefers joint trials when "two or more defendants are jointly charged with any public offense, ..." (§ 1098.) Moreover, an "accusatory pleading may charge two or more different offenses connected together in their commission, ... or two or more different offenses of the same class of crimes or offenses...." (§ 954.) As an exception to the rule of joinder, a trial court holds the discretion to order separate trials in the event certain defendants are charged with offenses not commonly charged against them all. (People v. Alvarez (1996) 14 Cal.4th 155, 190, 58 Cal.Rptr.2d 385, 926 P.2d 365.) A trial court's denial of a motion to sever charges of a codefendant is reviewed for an abuse of discretion. (Id. at p. 189, 58 Cal.Rptr.2d 385, 926 P.2d 365.) No abuse has been shown here, particularly in light of the legal arguments presented, all of which rest on archaic law, such as Williams v. Superior Court (1984) 36 Cal.3d 441, 204 Cal.Rptr. 700, 683 P.2d 699 and People v. Duane (1942) 21 Cal.2d 71, 130 P.2d 123.
Legally, the joinder was proper because the two sets of charges revolved around the two armed robberies, both of which were of the same class of crimes. Contrary to Cooper's contention, this analysis is to be done without regard to factual distinctions, but is "examined independently as the resolution of a pure question of law-whether the offenses are ... `of the same class of ... offenses[.]'" (People v. Alvarez, supra, 14 Cal.4th at p. 188, 58 Cal.Rptr.2d 385, 926 P.2d 365.) They are here.
Additionally, they were all connected in their commission in that the similarities in modus operandi and perpetrators supported a joint trial. Cooper contends there was no evidence that he was a gang member, and therefore any mention of the May robbery unduly prejudiced him. We think not. To begin with, there was evidence he was a gang member, as we discussed above. Next, he was identified as the driver of the getaway car in the May robbery which was identical in modus operandi to the June robbery. Thus, the evidence of the May robbery was potentially admissible against him under Evidence Code section 1101, subdivision (b), even though uncharged. (Cf. People v. Balcom (1994) 7 Cal.4th 414, 27 Cal. Rptr.2d 666, 867 P.2d 777 [evidence of *88 uncharged, but similar, offense admissible to prove common plan or design under Evid.Code, § 1101, subd. (b)].)
In the case of multiple defendants commonly charged with at least one crime, joint trial is preferred even though the defendants argue antagonistic defenses, such as accusing each other. (People v. Cummings (1993) 4 Cal.4th 1233, 1286, 18 Cal.Rptr.2d 796, 850 P.2d 1.) As has been often repeated in recent cases, joint trials of multiple defendants should not be severed unless a single defendant has made an "`"incriminating confession, prejudicial association with codefendants [could arise], likely confusion resulting from evidence on multiple counts [appears likely], conflicting defenses [are assured], or the possibility [exists] that at a separate trial a codefendant would give exonerating testimony."'" (Ibid.)
In Cummings, the defendants relied on inconsistent defenses, but that single reason failed to prove an abuse of discretion when the trial court denied the motion to sever. (Id. at pp. 1286-1287, 18 Cal. Rptr.2d 796, 850 P.2d 1.) In the case at bar, the defendants actually relied on similar defenses: They argued without testifying that they were not gang members, at least not at the time of these crimes. No abuse has been shown by the denial of the severance here.

B. Amendment of Information After Waiver of Preliminary Hearing
All parties waived the preliminary hearing in this case, resulting in the original complaint being filed as the information in the superior court in September 1998. That original pleading named the gang in all the enhancements as the Hoover Street Crips. However, in February 1999, the prosecution made a motion to amend the information, to delete the words, "Hoover Street," from the name. The motion was granted over objection, and the amended information was filed on February 10. Twelve people were sworn as the jury on February 11. Thus, jeopardy had not attached for constitutional purposes at the time of the amendment. (In re Mendes (1979) 23 Cal.3d 847, 853, 153 Cal.Rptr. 831, 592 P.2d 318.) No double jeopardy violation occurred. (See People v. Armendariz (1984) 37 Cal.3d 573, 581-582, 209 Cal.Rptr. 664, 693 P.2d 243 [jeopardy does not attach until alternate jurors are sworn].)
Under section 1009, a trial court may permit an amendment to the information "at any stage of the proceedings ... unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted. An ... information [cannot be amended to] charge an offense not attempted to be charged by the original complaint, except that separate counts may be added which might properly have been joined in the original complaint...." The trial court's discretion in permitting an amendment is extremely broad and is almost always upheld on appeal. (People v. Superior Court (Alvarado) (1989) 207 Cal.App.3d 464, 477, 255 Cal.Rptr. 46.)
In this case, the amendment was a mere technical variation from the original charge. It did not change the type of crime, the date of the crime, the victims of the crime, nor the persons being accused of the crime. (See People v. Gil (1992) 3 Cal.App.4th 653, 658-659, 4 Cal.Rptr.2d 697 [changing some of the dates on which lewd acts occurred was no surprise and was consistent with evidence taken at preliminary hearing]; see People v. Garringer (1975) 48 Cal.App.3d 827, 833-834, 121 Cal. Rptr. 922 [changing the type of drugs defendant was charged with possessing was *89 immaterial].) No substantial right was affected by this minor change; and all of the defendants had substantial opportunity to prepare a response to such a minor amendment.

IV

Brady[13] Violation and Sanction
Kizzee contends the trial court erred when, following discovery that the prosecution failed to divulge material information which would have discredited its DNA expert, Ikeda, it merely imposed the weak sanction of reading CALJIC No. 2.28[14] to the jury, instead of granting a mistrial or excluding the DNA evidence altogether. The pivotal information not revealed to the defense was that Ikeda, a DNA analyst in the Orange County Crime Lab's DNA department (OCCL), had failed a proficiency test required by the American Society of Crime Lab Directors (ASCLD). She took the test in November 1998 and learned of her failure on January 11. She relayed the information to a deputy district attorney on January 25.
The prosecution made a motion to admit the DNA comparison in order to identify Kizzee as one of the robbers in the May robbery and Tillett in the June robbery. The Kelly[15] hearing on the admission of the DNA evidence occurred on February 8 and 9, 1999. A deputy district attorney, specially assigned to all DNA issues, was present for that hearing but failed to inform the defense of Ikeda's test failure. At one point, the defense stipulated that OCCL used proper procedures, satisfying the third prong of the Kelly inquiry. He conditioned the stipulation, however, on his not having any contrary information: "I don't have any reason to think otherwise .... [F]or purposes of this hearing we'll stipulate ... unless something comes out ... with the witnesses, ..."
The DNA prosecutor later declared under penalty of perjury that he was present at the Kelly hearing as he was primarily *90 responsible for all DNA issues for the Orange County District Attorney's Office, although a different deputy was assigned to try the case. The DNA prosecutor then stated that he was personally unaware that Ikeda was the analyst who conducted the comparisons for the case against Kizzee and Tillett. He became aware of the cases in which Ikeda was the criminalist after February 19, but was unable to reach the trial deputy until February 22. At that time, the DNA prosecutor communicated the need to disclose the proficiency test failure by Ikeda to the defense; and the trial deputy complied with the discovery requirement that night.
Ikeda performed the PCR duplication and the subsequent DNA comparison on the samples in this case in September 1998. She received the certification test sample from ASCLD in October 1998 and then analyzed it in November. The test was a proficiency test, one aspect of the overall certification and compliance audit to maintain a lab's accreditation by ASCLD. In addition to these proficiency exams, the lab itself conducts an internal audit to insure compliance with quality control methods. Additionally, ASCLD reviews the records of OCCL every five years as part of that accreditation process. The proficiency test failure occurs when a sample, the source of which is known to ASCLD but unknown to OCCL, is submitted to the lab, but the lab then fails to make a "match" when a match should have been found. In other words, a person has been excluded as the source when that person actually was the source. The "failure" was not because a person was identified as the source when he or she was not the source. Finally, this proficiency test failure was revealed and discussed by Ikeda when she testified at trial; and the defense thoroughly cross-examined her about it, including criticizing her conclusions on other criminal cases.
The defense declared it would never have stipulated at the Kelly hearing had it known of the proficiency test failure by Ikeda. By failing the test, the defense argued, Ikeda's analyses and comparisons of Tillett's and Kizzee's blood samples had not met the third prong of the Kelly test. (See supra, fn. 15.) As sanctions for failing to obey the formal discovery motion and for failing to disclose all potentially exonerating evidence, the defense initially requested the DNA comparisons be excluded.[16] They subsequently asked for a mistrial. The trial court initially indicated the exclusion might be ordered but, following review of the formal papers submitted by the counsel for Kizzee and Tillett, the court denied both the mistrial motion and the exclusion request. Instead, the court selected the third option proposed by the defense: "an appropriate jury instruction."
The DNA comparison connecting Kizzee with the robbery of Szabo's jewelry store in May 1998 was of trivial evidentiary value. Kizzee was positively identified by Szabo as one of the gun-wielding robbers; he was also identified by Szabo as accompanying Cooper five days before the robbery, presumably to "case the joint." (See fn. 5, supra.) Szabo had a clear and close opportunity to view Kizzee on both occasions. Repeatedly. The DNA comparison *91 was merely cumulative of that identification.
Likewise, the DNA comparison connecting Tillett to the June robbery was completely unnecessary: Tillett was arrested after fleeing the scene with various officers in hot pursuit of him. Moreover, he was positively identified by two different witnesses of the robbery as a gunman.
Most importantly, a Kelly hearing on the admissibility of the DNA process of PCR was not required for admission of this evidence. The general acceptance and reliability of this scientific technique was established three years earlier in People v. Morganti (1996) 43 Cal.App.4th 643, 669-671, 50 Cal.Rptr.2d 837. As stated in People v. Wright (1998) 62 Cal.App.4th 31, at page 42, 72 Cal.Rptr.2d 246, "Our trial courts [should] no longer need to expend valuable time and resources on repetitive Kelly [ ] hearings directed to this issue of the admissibility of DNA evidence derived from the PCR method, as the trial court [did] in this case, now that the well-reasoned Morganti decision has become final...." because "[c]ase-by-case adjudication as to the `general acceptance' prong of the Kelly test is not required once the scientific technique in question has been endorsed in a published appellate opinion...." (People v. Barney (1992) 8 Cal. App.4th 798, 824-825, 10 Cal.Rptr.2d 731, original italics.)
Kizzee contends in his reply brief that conformance with proper procedures is an essential aspect of any DNA analysis requiring a new Kelly hearing, citing People v. Venegas, supra, 18 Cal.4th 47, 74 Cal.Rptr.2d 262, 954 P.2d 525. The Attorney General in that case argued that compliance with correct scientific procedures was not a requirement in that Kelly hearing. The Supreme Court rejected that position, noting that compliance with proper scientific procedures was the third prong of any Kelly hearing. However, Kizzee misunderstands the inquiry. The issue of Ikeda's failing a proficiency test was relevant to the weight that her opinion should carry generally; it had no relevance to the general issue of the admissibility of DNA comparisons by the PCR method, which is the purpose of a Kelly hearing. Ikeda's failure had no more relevance to the admissibility of the PCR technique any more than a particular fingerprint expert's poor eyesight has on the general admissibility of fingerprint comparison evidence. We do not neglect the importance in a Kelly hearing of the proponent of the scientific evidence showing that the particular instance employed the appropriate scientific procedures accepted in the relevant scientific community. However, as stated in People v. Venegas, supra, 18 Cal.4th at page 81, 74 Cal.Rptr.2d 262, 954 P.2d 525, "[t]he Kelly test's third prong does not, of course, cover all derelictions in following the prescribed scientific procedures. Shortcomings such as mislabeling, mixing the wrong ingredients, or failing to follow routine precautions against contamination may well be amenable to evaluation by jurors without the assistance of expert testimony. Such readily apparent missteps involve `the degree of professionalism' with which otherwise scientifically accepted methodologies are applied in a given case, and so amount only to `[c]areless testing affect[ing] the weight of the evidence and not its admissibility' [citation]." (Italics added.) The third prong of the Kelly test requires the proponent to show that the scientific evidence employed the very technique discussed and granted acceptance by the scientific community, and that results were obtained in a manner consistent with that approval. (Ibid.) As stated in Venegas, "the inquiry is whether the procedures utilized in the case at hand complied with that technique. *92 Proof of that compliance does not necessitate expert testimony anew from a member of the relevant scientific community directed at evaluating the technique's validity or acceptance in that community...." (Ibid.)
As described fully by Ikeda, her "failure" of the certification test was due to a contamination of two samples by her because of a labeling error. It did not affect the testing and comparison of the samples in the case of Simmons and Kizzee at all. It was relevant to impeach the credibility of Ikeda personally, not DNA evidence generally.
The prosecution failed to disclose the information to the defense in a rapid manner. It disclosed the information, however, in time for the defense counsel to present it to the jury before its assessment of Ikeda's testimony, and the weight and significance it should attribute to her credibility and opinion in this case. (See People v. Wright, supra, 62 Cal.App.4th at pp. 38-42, 72 Cal.Rptr.2d 246.) Because no Kelly hearing should have been held at all on the issue of the acceptability of the PCR technique, there was no harm by the failure to disclose the information before the hearing was held.[17]
Because the information was relevant only to Ikeda's credibility, and it was provided to the defense in a timely fashion for that purpose, Kizzee and Simmons were not denied a fair trial. The test for any Brady violation is whether there is "`a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" (In re Broum (1998) 17 Cal.4th 873, 886, 72 Cal. Rptr.2d 698, 952 P.2d 715.) Here, Kizzee and Simmons received a fair trial because they did have the impeaching information and cross-examined Ikeda with it; and that impeachment was the only issue to which it was relevant.
Kizzee responds that, irrespective of the disclosure before the witness testified, the instruction given by the court was an insufficient sanction. He argues the error was both a Brady violation and a violation of a formal discovery motion. Under section 1054.7, the prosecution is to provide all information to the defense at least 30 days before trial. The prosecution did not. Furthermore, the only sanction imposed was the instruction, informing the jury the prosecution had failed to provide certain information at the time it was supposed to, but the weight and significance of this failure was left to the jury to determine. (See fn. 14, supra.) Kizzee complains this was wholly inadequate. Had he attempted to suppress evidence, the prosecution would have been entitled to have the jury told to use the evidence as proof of his consciousness of guilt. (See CALJIC No. 2.06.)[18] Without a direct statement of *93 how the jury was to use this attempt to suppress evidence, he contends any such instruction was inadequate. Likening the discovery violation to a party admission, Kizzee argues the court should have excluded all mention of DNA evidence or, at the least, given an instruction telling the jury to penalize the prosecution directly.
Kizzee is mistaken. Had he attempted to conceal incriminatory evidence, the jury would have been told that it was up to them whether to find he did so, and that it could consider that attempt as a "circumstance tending to show a consciousness of guilt." It would not have been told that it was consciousness of guilt. (See CALJIC No. 2.06 at fn. 18, supra.) Moreover, the jury was told the prosecution failed to timely disclose evidence and that the failure was without legal excuse. However, it was also told the jurors had to decide if the matter related to an issue of importance "or if it was already established by other credible evidence." (See CALJIC No. 2.28, as given; see fn. 14, supra.) Finally, the jury held the responsibility to assess the "weight and significance of ... [the] delayed disclosures...." (See fn. 14, supra.)
The concealed information related to the ultimate issue of identifying Kizzee and Simmons in the May and June robberies. Their identification was quite well established by other credible evidence. The instruction was an appropriate one for the situation and sufficiently sanctioned the prosecution for its careless, artless and unprofessional handling of a matter which might have been highly important, but in this case, was merely cumulative to other evidence.

V[***]

VI

Instructions Defining "Personal Use" and "Personal Discharge of a Gun"
Kizzee, joined by the others, contends the court erred in imposing both the street gang enhancement under section 186.22, subdivision (b)[20] and section 12022.53, subdivisions (b) and (c),[21] because there was no specific finding that he personally used or discharged a firearm during the course of the gang-related crimes. Initially, we note that the verdict form signed and submitted by the jury specifically found Kizzee personally used a firearm during the May robbery and personally discharged a firearm during that crime. The specialized verdicts for each of the defendants' enhancements under section 12022.53 likewise used the exclusive language of personal use, and in a separate form, personal discharge of a firearm during the May robbery. Thus, the mandate that the jury must make a specific finding on any enhancing fact (see Apprendi v. New Jersey (2000) 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435) was met.
On the other hand, the court's instruction to the jury defining the term, "personal use" or "personal discharge" of a firearm during the robbery, gave the jury two alternate avenues for finding the allegation to be true: "Personal Use of Firearm [¶] Penal Code section 12022.53(b)(e)(1) [¶] It is alleged in Counts *94 3, 4, 5, 8, 11, 24, 26, and 30 that the defendant personally used a firearm during the commission or attempted commission of the crimes charged. [¶] ... [¶] ... [¶] For the purpose of this finding only the term `personally used a firearm,' as used in this instruction, means either (paragraph 1 or 2 below) of the following: [¶] 1.A. The defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it, or [¶] 2.A. The defendant was a principal in the commission or attempted commission of the charged felony, and [¶] B. The defendant or another defendant [italics added] in that charged felony (co-principal) personally used a firearm as described above in number 1, and [¶] C. That felony was committed for the benefit of, at the direction of, or in association with a criminal street gang, and [¶] D. At the time of the commission or attempted commission of such felony the defendant had the specific intent to promote, further or assist in any criminal conduct by gang members...." (See instructions, as given.)
The Attorney General contends the instruction was correct, relying on the narrow exception espoused in People v. Corona (1989) 213 Cal.App.3d 589, 261 Cal. Rptr. 765.[22] The court in Corona carved out a deviation from the normal definition of "personal infliction of great bodily harm." In Corona, a group of men attacked the victim, repeatedly hitting and kicking him. Corona was a member of this group, although the victim could not testify as to which defendant inflicted which injury. Charged with the enhancement of the personal infliction of great bodily injury, Corona argued he could not be guilty of the enhancement without such evidence. The appellate court disagreed, noting his personal conduct was proven to have been adequate to have inflicted the injury suffered by the victim. The court emphasized that "[i]n discussing the argument that in a moral sense one who directs an assault is as culpable as the actor himself, the court [in People v. Cole (1982) 31 Cal.3d 568, 183 Cal.Rptr. 350, 645 P.2d 1182] noted that expanding the scope of section 12022.7 [the enhancement statute] to persons who directed the infliction of injury would pose difficult questions in future cases. The court then stated: `In any event, the distinction between the person who actually inflicts the injury and the person who does not, is clearly consonant with the legislative purpose, and cannot be described as leading to absurd consequences.' [Citation.]" (Corona, supra, 213 Cal.App.3d at p. 593, 261 Cal.Rptr. 765.)
In Corona, the jury found the defendant personally battered the victim while other assailants inflicted simultaneous injuries of equivalent force, any one of which was sufficient to inflict the harm. In such a situation, it was impossible to determine the single source of the victim's great bodily injury because of the simultaneous actions of multiple perpetrators. "Thus, while it is true the evidence fails to directly attribute any particular injury suffered by [the victim] to any particular blow struck by [Corona], still, the blows were delivered, Corona joined in that delivery and the victim suffered great bodily injury." (Corona, supra, 213 Cal.App.3d at p. 594, 261 Cal.Rptr. 765.) In conclusion, the Corona court carved out an exception, but an intentionally narrow one: "We do not attempt to set forth a universally applicable test for when an individual ceases to be an accomplice and becomes a direct participant to the infliction of great bodily injury. We conclude only that when a defendant *95 participates in a group beating and when it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered." (Ibid., italics added.)
The Corona exception does not apply here. Each defendant must have committed some act which meets the "personal" action required under the enhancing statute. Here, the jury was told it did not need to find such personal conduct. All it had to find was that one of the four defendants committed the act of personally using or firing a gun, then all other principals were likewise imputed to have "personally" discharged the gun. That is distinctly not what the statute requires.[23]
A similar situation arose in People v. Magana (1993) 17 Cal.App.4th 1371, 22 Cal.Rptr.2d 59 in which a gang-motivated drive-by shooting resulted in injuries being sustained by a father and infant son, as well as the death of a rival gang member. Both Magana and another gang member by the name of Adamefired their weapons into a crowd. The prosecution failed to determine which caliber ammunition inflicted the harm on which victim. Magana had either a rifle or a shotgun; Adame had a handgun. Nothing further was provided by the prosecution to differentiate the harm perpetrated by the two defendants. However, an instruction permitting an aider-and-abettor liability to be found by the jury for the personal infliction of bodily injury enhancement was given. That instruction was in error.
The "analytic touchstone" for the Corona exception is "the impossibility of determining which injury the accused had actually inflicted.... [I]n this action, the People could have proved which injuries defendant caused. Eyewitness testimony established that defendant and Adame used different weapons.... [T]he People, through expert testimony, could have opined which firearm discharged which bullet.... The submission of instructions on the law of aiding and abetting liability was error given [the decision in Cole, supra, 31 Cal.3d 568, 183 Cal.Rptr. 350, 645 P.2d 1182].... In any event, the record does not contain substantial evidence to sustain the required findings that defendant personally inflicted great bodily injury.... This failure of proof compels striking [] the enhancement[]...." (People v. Magana, supra, 17 Cal.App.4th at p. 1381, 22 Cal.Rptr.2d 59.)
Likewise here. The prosecution failed to prove which defendant fired a gun while fleeing the June robbery. This is significant in light of the fact the jury found all four defendants personally responsible for firing a gun during the June robbery, yet found only Kizzee and Tillett personally used guns to commit the burglary charged against all four of them as an alternative statement of the same crime. The personal discharge of a gun enhancement must be stricken as found against each defendant.

DISPOSITION
The findings for the enhancements under section 12022.53, subdivisions (b)the personal use of a gun during one of the listed crimes for the benefit of a gang *96 and subdivision (c)the personal discharge of a gun during one of the listed crimes for the benefit of a gangas found against each defendant are reversed for instructional error. The remainder of the convictions are affirmed. However, the reversal of these enhancement findings eviscerates the trial court's sentencing scheme as to each defendant, deleting as it does 20 years from each of the defendants' prison terms. We therefore remand the case for resentencing, to permit the sentencing court to reassess its general scheme for appropriate penalty as to each defendant. (See People v. Burns (1984) 158 Cal.App.3d 1178, 1184, 205 Cal.Rptr. 356.)
BEDSWORTH and MOORE, JJ., concur.
NOTES
[*] Pursuant to California Rules of Court, rule 976(b) and 976.1, this opinion is certified for publication with the exception of part V.
[**] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977.)
[1] Tillett received a total of 25 years, comprised of 5 years for one count of robbery and 20 years for personally discharging a firearm during that robbery which benefited a gang. Kizzee's sentence totaled 34 years, 4 months, comprised of 5 years for the one count of robbery, 20 years for the personal discharge of a gun during the robbery which benefited a gang, 5 one-year terms for 5 prior prison terms, 1 year for a different robbery, and 3 years, 4 months for the firearm use on the second robbery. Simmons was ordered to prison for 27 years, which included 5 years for the one robbery count, 20 years for the personal discharge of a gun during that robbery, which benefited a gang, 1 year for the other robbery and 1 year for a prior prison term. The court's coup de main was reserved for Cooper: 60 years to life, which reflected an indeterminate term of 25 years to life on the same robbery count as was used as the base term for the others, two concurrent life terms for two more counts from the same robbery, 15 years for three, 5 year prior serious felonies, and 20 years for the personal discharge of a gun during the robbery, which benefited a gang.
[2] The jury acquitted all four defendants of a charge of street terrorism under Penal Code section 186.22, subdivision (a) and an attempted murder charge, finding the lesser included offense of assault with a semiautomatic firearm instead. (Pen.Code, § 245, subd.(b).) The trial court also dismissed the four counts relating to the weapons charges after the jury returned its guilty verdicts on those counts.
[3] All but Tillett had prior felony convictions in their background, but the allegations arising from them were bifurcated and thus not discussed before the jury.
[4] Yener Szabo, the store owner, lost about $6,500 worth of jewelry just from his person. One of the women in the store lost cash and personal jewelry valued at about $3,500.
[5] Somewhat ironically, this witness also positively identified Cooper as the driver of the car parked in the handicapped spot, although the prosecution did not charge Cooper with aiding and abetting the armed robbery of Szabo's store. Moreover, both Kizzee and Cooper were identified as having visited Szabo's jewelry store less than a week before the robbery. They inquired about wedding rings and then departed.
[6] Patrick O'Brien was seated, having lunch at the Golden Truffle restaurant, a few doors from the jewelry store. He watched four men, one of whom he identified as Simmons, come out of the store carrying a pillowcase filled with small boxes. Suddenly, he saw Ceresani come from the same direction, pointing a gun at the four men. He hit the deck just as shots were fired.
[7] Additionally, Kizzee's girlfriend told a police officer that he was a member of "Foe Trey" (gang lingo for 43rd Street Crips) and Hoover subgroups of the Crips.
[8] Additionally, Tillett's former girlfriend told a police officer that Tillett was an active member of the Main Street Crips but had recently started associating with the Hoover Crips. Finally, Tillett admitted to authorities in 1994, 1996 and 1998 that he was a Main Street Crips member, and that his nickname was "Criminal."
[9] In opining the robberies were for the benefit of a criminal street gang, Magnuson stated "it was done with a group of individuals that have a common name or common symbol that they use identifying them as a street gang. They went in and did a criminal act, again, to instill fear within people in that establishment. And they did it to intimidate that community. That's what street gang members do."
[10] All further section references are to the Penal Code unless otherwise stated.
[11] Both robbery and carjacking are listed under section 186.22, subdivision (e).
[12] Tillett petitioned us for leave to file a supplemental letter brief on this issue, which we grant.
[13] Brady v. Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 established that due process and fundamental fairness requires the prosecution to disclose to the defense any and all potentially exculpatory evidence.
[14] CALJIC No. 2.28 states "The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save court time and avoid any surprise which may arise during the course of the trial. Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence. [¶] Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the People failed to timely disclose the following evidence: [¶] Proficiency test results. [¶] Although the People's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial. [¶] The weight and significance of any delayed disclosure are matters for your consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matter already established by other credible evidence." (Italics added.)
[15] People v. Kelly (1976) 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 established the procedure through which the admission or exclusion of evidence of a recently developed scientific technique is determined. In the case at bar, the parties stipulated to use the transcript of a previous Kelly hearing in which all the issues surrounding the admission of PCR analysis of blood samples were discussed and ruled admissible. It was pursuant to this stipulation that the issue of the "third prong" of Kelly was raised: Did the prosecution's lab conduct the test in this case in the proper manner and using proper safeguards?
[16] It is rather confused, but apparently there was a concern that a continuance was the appropriate sanction for the blood samples to be retested and new comparisons obtained, including the opportunity for the defense to have retests done at the labs of their choice after the new tests by OCCL. However, that was physically possible only with the sample from the van, matched to Tillett; the sample on the jewelry box connected to Kizzee was consumed in the original test. Thus, no retest could be done on that sample, irrespective of the time needed.
[17] "`"[T]he Kelly [] rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied. [Citation.] Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony."'" (People v. Morganti, supra, 43 Cal.App.4th at p. 667, 50 Cal.Rptr.2d 837.)
[18] CALJIC No. 2.06 provides that if the jury finds "that a defendant attempted to suppress evidence against himself [ ] in any manner, such as ... by concealing evidenced this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."
[***] See footnote *, ante.
[20] An enhancement under section 186.22 carries a range of additional time in prison of two, three or four years, under subdivision (b).
[21] The enhancement under section 12022.53 carries an enhancement of 10 years if the defendant personally used a firearm during one of the enumerated crimes under subdivision (b) and 20 years if the defendant personally discharged a firearm during one of the enumerated crimes under subdivision (c).
[22] See also In re Sergio R. (1991) 228 Cal. App.3d 588, 279 Cal.Rptr. 149.
[23] The evidence was somewhat in conflict as to which defendants actually fired their weapon at Ceresani. According to Ceresani, two of the four robbers shot at him. One was on the driver's side; the other was on the passenger side but it was unclear whether he was in the front or back seat. The problem was that the location of each robber inside the Cadillac was never established.